NATIONAL ENAMELING & STAMPING CO. v. HABERMAN.

(Circuit Court, D. Connecticut. January 29, 1903.)

No. 1,095.

1. CONTRACTS—LEGALITY—RESTRAINT OF COMPETITION.

A restrictive covenant, made by one capable of contracting, which is unlimited as to time, in area covers the entire United States, is ancillary to the main lawful contract (being in part consideration of the payment for good will sold), and is reasonable and no broader than is necessary to save to the covenantee the rights and privileges for which he has paid, may be enforced.

In Equity. On demurrer to bill.

Guggenheimer, Untermeyer & Marshall, for complainant.
Gross, Hyde & Shipman, for defendant.

PLATT, District Judge. Aside from a minor objection, raised by the defendant with evident seriousness, which will be disposed of hereafter, the broad contention arising in the case at bar which I am asked to consider is this: The plaintiff claims that a restrictive covenant, made by one capable of contracting, which is unlimited as to time, and in area covers the entire United States, and is ancillary to the main lawful contract, being in part consideration of the good will sold, and is reasonable, and is no broader than is necessary to save to the covenantee the rights and privileges for which he has paid, may be enforced. The defendant urges that such a contract is

¶ 1. Monopolistic contracts—validity as affected by public policy, see notes to Chicago, M. & St. P. Ry. Co. v. Wabash, St. L. & P. Ry. Co., 9 C. C. A. 666; Cravens v. Carter Crume Co., 34 C. C. A. 486.
See Contracts, vol. 11, Cent. Dig. §§ 559, 565–567.

in general restraint of trade, and therefore void. It is not thought that any case can be found in the federal courts which sustains flatly and unequivocally the position taken by the plaintiff. Before entering upon the discussion, it may be well to suggest that no case appears, so far as I am informed, in the courts of England, or of this country, including federal and state, where the controlling feature upon which the contract was declared void has been purely and simply, without more, its unlimited extent. If I am right about this, it follows that all which has been said about such contracts has been obiter dictum, and is peculiarly sensitive to the reasons which have always obtained for scanning such opinions with unusual care. It cannot be disputed that the age of such dicta entitles them to great respect, and that by constant repetition they have become ingrained into the fabric of English and American law and equity. Despite this fact, dicta they are, and can be investigated and analyzed as every dictum ought to be. They will be treated with the veneration and respect due to their distinguished ancestry and extensive service, and such treatment should be the more emphasized, since the critic is a modest explorer in the paths which have been hewn out by those whom he reveres and emulates.

Passing over the immortal immorality of Hull, J. (2 Hen. V, fol. 5, pl. 26), and the general discussion of the subject to be found in the famous judgment entered by Chief Justice Parker (later Lord Macclesfield) in Mitchel v. Reynolds, 1 P. Wms. 181, and taking up the matter at the point where our own courts began to scrutinize it with care, no better statement of the objections to such a contract can be found than the one expressed by Morton, J., as the unanimous conclusion of the famous Massachusetts court over which the late and lamented Shaw presided as chief justice. Alger v. Thacher, 19 Pick. 51, 31 Am. Dec. 119:

"(1) Such contracts injure the parties making them, because they diminish their means of procuring livelihoods and a competency for their families. They tempt improvident persons for the sake of present gain, to deprive themselves of the power to make future acquisitions. And they expose such persons to imposition and oppression. (2) They tend to deprive the public of the services of men in the employments and capacities in which they may be most useful to the community as well as themselves. (3) They discourage industry and enterprise, and diminish the products of ingenuity and skill. (4) They prevent competition and enhance prices. (5) They expose the public to all the evils of monopoly. And this especially is applicable to wealthy companies and large corporations, who have the means, unless restrained by law, to exclude rivalry, monopolize business, and engross the market."

And even then, in 1837, in the midst of the stern and inexorable environments which nature provided for the asylum to which our Pilgrim Fathers fled, the court quoted with approbation the language of Chief Justice Best in Homer v. Ashford, 3 Bing. 322, from which the following excerpt is culled: "Any deed, therefore, by which a person binds himself not to employ his talents, his industry, or his capital in any useful undertaking in the kingdom would be void, *because no good reason can be imagined for any person imposing such a restraint upon himself.*" The italics are mine. Omniscience is not a prerogative of the earthly judiciary; no human brain could

conceive, no earthly eye could penetrate, the possibilities which steam and electricity have already converted from the vagaries of the dreamer into practical everyday facts.

In the Addyston Pipe & Steel Co.'s Case, 29 C. C. A. 141, 85 Fed. 284, 46 L. R. A. 122, Judge Taft, with the wave of a wand which in 1837 would have been deemed that of a magician, sweeps away a large portion of the fancied objections presented in Alger v. Thacher.

Before we come to that let us see what Massachusetts has done in the way of reparation. Taylor v. Blanchard, 13 Allen, 370, 90 Am. Dec. 203, was decided in 1866. In that case the facts disclosed that Blanchard, as one of the copartners of Taylor & Blanchard, agreed not to carry on the business of manufacturing and selling shoe cutters in the commonwealth, except with the copartnership, nor to interfere in any way with the business; and further that he would not divulge secrets, etc. The court held the contract void, but in that year and day some glimmering light, shed by the approaching effulgence, entered the eyes of the judges. The plaintiff contended that in this country a contract ought not to be held void unless it extended throughout the United States. "No," they said, "we cannot accede to that. A monopoly extending throughout the state may be as really injurious to the people of the state as if it extended throughout the whole country." And they add this significant and pertinent thought:

"Whether the principle extends to a case where, by means of traveling agents, one has extended his business through a large part of the country, or a large part of the state, and sells the good will of the business with a restriction merely coextensive with that good will, and not extending beyond the actual sphere of the business of the vendor, we need not discuss. The law regards the good will of a particular trade as property having a market value, and protects it to a reasonable extent, depending somewhat upon the nature and character of the business."

And very soon thereafter (in 1869) along came the case of Machine Co. v. Morse, 103 Mass. 73, 4 Am. Rep. 513. The court therein held a contract valid in which the defendant agreed "at no time to aid, assist, or encourage in any manner any competition" against a business sold with its good will, and told him that he had sold the good will, which was valuable, and had been well paid for it, and that he could not have so sold it if he had not agreed never to interfere with it, and that by his acts he was taking back a part of what he had sold. The court very distinctly affirms in the opinion that the case does not turn upon the point that a patent is concerned in the contract, and, aside from that consideration, it is very instructive and enlightening, and very much like the one at bar, and I express with pleasure my acknowledgments for its helpful influence.

And again, on May 18, 1898, in deciding Electric Co. v. Hawkes, 171 Mass. 101, 50 N. E. 509, 41 L. R. A. 189, 68 Am. St. Rep. 403, the court was unanimous, speaking through Knowlton, J., in an opinion which seems to give practical assent, certainly not violent dissent, to the broader rule toward which many courts, at home and abroad, are advancing.

The question at issue has received little attention at the hands of the federal courts, but the inferences which may be legitimately drawn

from certain bits of reasoning which come to the surface here and there should encourage and in no sense dishearten the plaintiff.

Our eyes always turn with deep interest to the case of Oregon Steam Nav. Co. v. Winsor, 20 Wall. 64, 22 L. Ed. 315, which was decided in 1873. That decision certainly settles the proposition that a contract in restraint of trade is not to be governed by state lines. Up to that time there had been decisions in state courts maintaining what might be called an offshoot of the state rights doctrine, and placed upon the ground that to enforce the contract to abstain from meddling within any particular state would compel the covenantor to transfer his residence and allegiance to another state if he would pursue his vocation. The country had become one country, and citizenship of that country had come to mean a great deal; and parenthetically I may say that it has to-day come to mean vastly more than it did in 1873. Cases must be judged according to their circumstances, the supreme court said, and can only be rightly judged when the reason and grounds of the rule are rightly considered. The shopworn dictum is again laid down (and I am compelled with all due respect to so characterize it), that the evils of restraint appear whenever one has agreed not to carry on his trade at all, or not to pursue it in the entire realm or country. But, after assuming that axiom, the court says "that a stipulation by a vendee of any trade, business, or establishment that the vendor shall not exercise the same trade or business, or erect a similar establishment, within a reasonable distance, so as not to interfere with the value of the trade, business, or thing purchased, is reasonable and valid." And the same rule is applied to a vendor. And, later: "It is clear that a stipulation that another shall not pursue his trade or employment, at such a distance from the business of the person to be protected as that it could not possibly affect or injure him, would be unreasonable and absurd. On the other hand, a stipulation is binding which imposes the restraint to only such an extent of territory as may be necessary for the protection of the party making the stipulation, provided it does not violate the two indispensable conditions that the other party be not prevented from pursuing his calling and that the country be not deprived of the benefit of his services." And so the court practically sustains this plaintiff's contention, except for the axiom, which curtails the reasoning front and rear. Some axioms, especially those to be found in the exact sciences, have continued for ages. Other axioms, so called, are subject to revision as the facts upon which they were founded yield to the advancement of accurately ascertained truth. I respectfully condemn this one to the latter class.

My reading of the Oregon Steam Nav. Co. Case convinces me that I am only carrying coals to Newcastle as I work at this problem. It would seem that the solution must be obvious to those better equipped to solve it than myself, and I have only taken up the burden so that my conscience may assure me that I have shirked no duty imposed upon me by the enforced situation.

In Gibbs v. Gas Co., 130 U. S. 396, 9 Sup. Ct. 553, 32 L. Ed. 979, decided in 1888, although the case turned upon other points, Mr.

Chief Justice Fuller, speaking for the court, referred to the question of contracts in restraint of trade. He says that the rule laid down in Mitchel v. Reynolds, 1 P. Wms. 181, was made under a different condition of affairs and state of society than that which existed at the time of the opinion, and had been even then considerably modified. "Public welfare is first considered, and if it be not involved, and the restraint upon one party is not greater than protection to the other party requires, the contract may be sustained. The question is whether, under the particular circumstances of the case and the nature of the particular contract involved in it, the contract is or is not unreasonable."

Carter v. Alling (C. C.) 43 Fed. 208, was decided by Circuit Judge Blodgett in 1890. Plaintiff had an ink and mucilage business extending throughout the United States and Canada, and the defendant, their employé, agreed not to work for any competitor for three years after leaving the employ of the plaintiff. The contract was held valid. Several of the expressed views of the judge are enlightening, to say the least of them. I insert two quotations:

"In later years a further relaxation of the old rule has grown up both in England and America, and the courts have repeatedly recognized the validity of contracts in restraint of trade throughout the entire state or country when such restraint was not unreasonable, in view of the nature and extent of the business of the covenantee."

"The modern agencies of commerce have enlarged the field for the manufacturer and salesman to, or even beyond, the limit of the continent; and to whatever extent a manufacturer or dealer has by his energy or enterprise made a market for his wares, to that extent he has the right to protect his business from piratical competition by contracts like the one under consideration."

In U. S. v. Addyston Pipe & Steel Co., 29 C. C. A. 141, 85 Fed. 271, 46 L. R. A. 122, decided in 1898, Judge Taft, then circuit judge of the Sixth circuit, whose later career is known and applauded of all men, wrote the opinion, and it sheds a flood of light upon this contention. The opinion enforces, in an admirable way, the impropriety of the claim then advanced, that, if a contract has "no purpose but to restrain competition and maintain prices," it will be held valid if reasonable. That was the doctrine, which, if established, would lead courts "to set sail on a sea of doubt." But the learned court maintains that in cases where the main contract is legal, as, for example (and this is my own illustration), in the case of the sale of a going plant, with the good will attached, and as ancillary thereto a covenant is entered into that the party will do nothing which in any way shall compete with or diminish the value of the thing sold, such covenant shall be enforced.

The very late case (Harrison v. Refining Co.) decided by the circuit court of appeals in the Seventh circuit (opinion by Circuit Judge Jenkins, May 6, 1902; 116 Fed. 304), indicates a disposition to take a view somewhat similar to that which has been adopted herein, although the exact issue which confronts me was not there involved. I avail myself of the learning therein displayed, and commend the authorities cited to those interested in the general discussion.

The third reason in the statement from Alger v. Thacher, does not

seem to have been taken up by Judge Taft in the Addyston Pipe Steel Co.'s Case, except inferentially. That reason is that industry and enterprise are discouraged, and the products of ingenuity and skill diminished, by the enforcement of general restrictive covenants. It would seem, however, that such contracts would encourage rather than discourage industry and enterprise. The utmost exercise of those and other talents is required to bring a business into such a condition that capital seeks to absorb it, and certainly the addition of fresh capital to its exploitation does not tend to diminish its product. Such contracts do not eliminate competition. The vendor simply puts up a barred fence between himself and the competitive field. To the mind of the court it is a far cry to monopolism and engrossing from such a case as the one before us. The nature of things itself provokes competition. Whenever a field, no matter how large, yields abundant harvests under the present improved methods, fresh capital is envious, and eager to enter and share the fruits. The wise investor will enter the territory at the earliest prudent moment. Cheap production, cheap delivery, and wise management almost inevitably bring large profits. The open door leads to boundless possibilities. No one band of associated capitalists can control a market very long. Any attempt to abuse the public confidence must result in public indignation and determined resistance. The truth of these words has been lately demonstrated. It may be that I trench upon political economy, which is more directly within the domain of the legislative function of our government; but if, with these observations, is coupled the doctrine that, in reaching a judicial conclusion as to the propriety of an unlimited restrictive covenant which is ancillary to the main lawful covenant, the monopolistic tendencies of such a covenant shall have the greatest weight in determining whether the ancillary covenant is valid; in other words, that the court shall not only see to it that the restriction is no greater than the need which demands it, but further, and especially, that it does not carry with it monopoly, even as an incidental attachment,—the danger to the country will be doubly checked.

The New York court of appeals, in the case of Diamond Match Co. v. Roeber, 106 N. Y. 473, 13 N. E. 419, 60 Am. Rep. 464, canvassed the general question of contracts in restraint of trade with much care and ability. The decision almost covers the present contention of the plaintiff, and leads the candid mind to accept the belief that the same logic, followed to its inevitable conclusion, would without question reach the desired haven. Defendant's counsel frankly admits that he would dislike to follow his contention into that forum. Later New York decisions establish, beyond cavil, the force of the Diamond Match Co. Case in that jurisdiction.

I have examined, with some care, all the opinions which have been promulgated by the highest courts of the various states since the Diamond Match Co. Case decision was published. Without question, a number of courts have been visibly disturbed at the contemplation of the far-reaching effect which it is feared that it may hold concealed within its bosom, but in every case of that kind the perturbation is plainly due to the decided bias toward monopoly,

which the facts of the particular case disclosed. The reasonableness of the restrictive covenant, be the restraint partial or general, is clearly a question of law, and the only concession required is that the monopolistic taint shall be a prime factor in the search for the reasonableness. Conceding that, it is not clear why any tribunal should be perturbed. It will be quite as easy for the courts to protect the public under the broader doctrine as to be forced to seek refuge under the now practically worthless distinction between general and partial restraint. I suspect that monopoly will have its innings under any rule. "Many littles make a mickle," says the old proverb; a sufficient number of seemingly harmless partial restraints might, when combined, produce a downright monopolistic and engrossing general restraint. If the general restraint can be searched at the outset to discover whether or not it is reasonable, it is hoped that monopoly could be with the greater ease suspected and detected.

England has become, with New York, an equally agreeable forum for this plaintiff to seek. Nordenfelt v. Ammunition Co., [1894] App. Cas. 535. It is unnecessary to do more than cite that case with the comment I have made. A perusal of the opinions of the law judges in the house of lords will well repay the studious and thoughtful.

Tindal, C. J., in deciding Horner v. Graves, 7 Bing. 735, thus characterizes the so-called rule of Lord Macclesfield:

"The lord chief justice says, 'A restraint to carry on a trade throughout the kingdom must be void; a restraint to carry it on in a particular place is good;' which are rather instances and examples, than limits of an application, of the rule which can only be at last what is a reasonable restraint with reference to a particular case."

Lord Ashbourne gives the double quotation the sanction of his name in the house of lords case.

In the strife for commercial supremacy which the nations of the world have now entered upon it would seem suicidal for this government, through its judiciary, to lag one whit behind the marching squadrons. In business transactions undeviating honesty is a prime factor. If that factor is eliminated, or even suspected, the handicap upon enterprise, advancement, and material progress will be serious, if not intolerable. The parties made the contract in suit with painstaking care. Why should the defendant not occupy the position into which he cramped himself by his own act? The answer, most vociferously enunciated, is that the public will be the loser thereby. Many ways in which it cannot lose have been adverted to. If there is danger at all, is it not much less dangerous to lay down the hard and fast rule that freedom of contract will always be sustained, provided such freedom is reasonably exercised? Freedom without that exception degenerates into license. In any event, would the anticipated harm be at all comparable to the enormous advantages which must accrue when it shall have become for all time the settled law that every man must abide by his bargain honestly made, when no lingering smirch of guilty design or harmful purpose clings thereto? It should not be so that a bargain which, upon every principle of justice, equity, and decency ought to be rigidly enforced, shall in any case be rejected because of some lingering respect for tradition.

It is suggested that the contract in suit might properly be designated as one in partial restraint. Such treatment would seem to the court to contain the weakest of sophistries, and the veriest trifling with a great matter. As affairs advance in the newly acquired portions of our territory, it is not unlikely that those of us who are permitted to live out the years allotted to us by the psalmist will see the day when such a distinction will have been consigned to the obscurity from which it emerged, but such a day has as yet given no more than a promise of dawning. Nor would it have been wise on the part of the plaintiff to have excepted Nevada or Montana, any more than it would have been wise to except the top of the most inaccessible mountain peak. In my opinion, the exception in the Diamond Match Co. Case was colorable. Such an exception does no more than to furnish a loophole for the stickler after custom and precedent. Others may call the contract in suit what they will; for my part, I choose to call it a contract in general restraint of trade.

Beyond this, it is only necessary to touch lightly upon the other contention of the defendant. With the main problem solved, the further objection is trivial. I cannot regard with favor the claim that the defendant was a mere stockholder in the vendor company, and, therefore, was not concerned in the good will at all. He has all the qualities which render his restrictive covenant of great value, and, that fact being recognized by the parties, he received $50,000 in addition to his stockholder's share of the fruits of the sale. Possibly his dangerous proclivities were suspected; be that as it may, his superior value was clearly recognized and very well paid for in advance. He ought to be the last man on the list of covenantors to find fault with the bargain which he made, presumably, in the best of faith.

Let the demurrer be overruled, with costs.