[No. 6577.]

## Barrows v. The McMurtry Manufacturing Co. et al.

1. Contracts—*Validity—Restraint of Trade*—One purchasing the business of a competitor with the good will thereof may lawfully exact from the seller a stipulation not to carry on the same business within such limit of time and space as is reasonably necessary for the buyer's fair protection. There mere fact that such restraint extends to the limit of the state, or even to a wider territory, is not of itself sufficient to condemn it. The public welfare is the first consideration, and if this is not adversely affected, and the contract imposes upon the seller no greater restraint than is necessary for the protection of the buyer, it is sustained.

2. MONOPOLY—*Discountenanced*—The law regards with high dis-
favor any condition that tends to stifle competition in the necessities
of life, or in those things which contribute to the general comfort and
welfare, and where such condition is asserted the court will make
most careful and diligent inquiry to ascertain the very truth of the
matter.

3. ——*Evidence*—That a dealer, after purchasing the stock and
good will of the competitor, advances the price of the commodity
which is the subject of his business, is not sufficient of itself to estab-
lish an improper motive as animating his purpose. The question is
best determined by the prices demanded by other dealers in the same
commodity within the same territory, and the effect of the new quota-
tions upon the general market.

Where after the purchase there still remained in the same field
many competitors, and the defendant himself, shortly after disposing
of his stock, again engaged in the same line of trade, in violation of
his covenant, the contention that the purchase in question tended to
create a monopoly was held to be entirely overthrown.

3. DURESS—*Evidence*—Defendant had sold his stock, business
and good will, covenanting not to engage in the same line within a
limited time and area. On bill brought to restrain the violation of
this covenant the defense was that defendant's contract was induced
by threats made by the plaintiff. The fact that, very shortly after the
sale, defendant had resumed business in the same line was held to
negative this contention.

4. CONTRACTS—*Inviolability of*—*Public Policy*—To a bill to re-
strain the defendant's violation of a covenant not to engage in a cer-
tain business for a limited time and area, the defendant set up the
unfounded pretense that the sale of his stock and good will upon
which his covenant was founded conferred a monopoly upon plaintiff,
or tended so to do. The court, repelling this contention upon the facts
shown, observed that while the general welfare is subserved by healthy
competition there can be no sound or wholesome public policy which
lends approval in the slightest degree to the open violation of personal
contracts entered into in good faith, and upon fair consideration; that
it is quite as important to the public welfare that evil minded persons
be not allowed to transgress with impunity their solemn undertakings,
as that the public should have protection in other respects.


*Error to Denver District Court.*—Hon. GREELEY W.
WHITFORD, Judge.

Messrs. DAVIS & WHITNEY, for plaintiff in error.

Messrs. CRANSTON, PITKIN & MOORE, for defendants in error.

Mr. JUSTICE BAILEY delivered the opinion of the court:

The action was by defendants in error against Stanley M. Barrows, plaintiff in error, to enjoin him from continuing to violate the terms of a certain contract entered into May 5th, 1906, between himself, his sister and brother of the first part, the Denver Plate Glass Company of the second part, and the defendants in error of the third part. The defendant was the largest stockholder in, and president and general manager of, the Denver Plate Glass Company, a corporation engaged in the business of handling paints, varnishes, and plate and window glass in Colorado and neighboring states. The McMurtry Manufacturing Company and the McPhee & McGinnity Company, plaintiffs, were engaged in similar business in about the same territory. The chief place of business of the three companies was Denver, where their main offices were located. Under the contract the entire stock in trade of the Denver Plate Glass Company, except a portion of the paint stock, was sold to the plaintiff companies, including the good-will of the company and that of Stanley M. Barrows and his brother and sister. The amount charged and paid for the good-will was $2,500.00. Among other things, the contract contained the following:

"And the parties of the first part and each of them agree with the third parties that if there is a consummation of this deal, until May 1st, 1916, they will not, nor will any of them, engage directly or indirectly in any business in the state of Colorado, which carries, handles or sells paints, varnishes or glass, or accept employment with or work for any house or business which handles any such goods or merchandise or class of business, or invest any money in or become stockholders or directors in any company or corporation which in any way carries on in the state of Colorado any class of business similar to that heretofore carried on by second party."

In substance, the complaint alleges that defendant violated this covenant, in that, soon after the consummation of the sale, he not only engaged in the glass business himself, but was instrumental in the organization of certain corporations within the state for like purposes, one of which, in particular, the Independent Glass Company, was incorporated within two weeks after the execution of the contract. The defendant answered that the contract is against public policy, secured under a collusive and fraudulent agreement for the purpose of creating a monopoly in restraint to trade, and therefore void; and further, that it was executed by the defendant under duress, and for that reason unenforcible. A replication denied the charges of duress and conspiracy and other affirmative defensive matter. The court, without a jury, upon hearing found the issues joined generally for the plaintiffs, with specific findings as follows:

"That said defendant, Stanley M. Barrows, received and obtained a good and valuable consideration for the execution of said agreement, and for the making of the personal covenants made by him and contained therein; that the said contract was not executed by him under duress of any kind, nor under intimidation or coercion of any kind, but was executed of his own free will and volition, and solely and alone for the consideration arising therefrom, and for the benefits he would receive from the payment of the moneys therein agreed to be paid; that neither the said contract nor any part thereof was or is invalid or void; that no agreement or covenant therein contained was or is in restraint of trade, and that the agreements therein contained made by the defendant, including the agreement contained in said tenth paragraph, were and are reasonable and fair, and were necessary to protect the plaintiffs in the purchase made by them of goods, wares and merchandise, and good-will.

Second. The court finds, from the evidence, that said contract was not obtained by plaintiffs for the purpose of, nor with the intention of, securing or obtaining any monopoly of

any kind, at any place, of any business, trade, occupation or calling, and that no monopoly of any kind was in any way obtained by plaintiffs, through or because of the execution or consummation of said contract, or at all. The court finds from the evidence that neither the said written contract nor any agreement therein contained was ever in any way waived or cancelled, or discharged by plaintiffs, or any of them, and that the said contract and all of the agreements made by plaintiffs have been fully kept and performed by them, and that said contract is now in full force and effect, and that plaintiffs are entitled to have the same specifically enforced and carried out.

Third. The court, from the evidence, specifically finds that each of the defenses interposed in the answer of defendant is not sustained by the evidence, and on all of said defenses and on all of the issues herein joined, the court finds for the plaintiffs.

Fourth. The court finds that the defendant, Stanley M. Barrows, from time to time, and frequently and continuously, by various and sundry pretenses, practices, devices and machinations, both directly and indirectly, has sought to evade, and has evaded, and has infringed and violated the terms of said agreement, and more particularly the provisions of paragraph 10th thereof; that he, the said defendant, has been and is associated with the Independent Glass Company, a corporation doing business in Denver and throughout the state of Colorado, and which corporation was organized for the purpose of carrying, handling and selling, and which corporation has carried, and does carry, handle and sell glass in Denver and throughout the state of Colorado, and that he has worked for said The Independent Glass Company, has taken orders for it and has sought to build up its business in divers ways, and to deprive the plaintiffs of the benefit of the agreements made by the Denver Plate Glass Company and the defendant in said written contract of May 5, 1906, and that through said the Independent Glass Company he has been and is engaged in doing business in the state of Colorado, and handling and selling

glass therein, and that the plaintiffs have suffered, and will continue to suffer, great and irreparable injury by the violation of said contract by defendant, unless they receive the protection of a court of equity.

Fifth.    The court further finds from the evidence that the said defendant has, under the guise of conducting the business of an agent for a plate glass insurance company, kept his office in the same room with the said the Independent Glass Company, and has been therein engaged in directing, or aiding in directing, the business of the said the Independent Glass Company, and that the practices and conduct of the defendant have been such that in order to make effective the said contract of May 5, 1906, and to protect the plaintiffs therein, it will be necessary for the court to restrain the said defendant, among other things, from continuing to maintain his office or place of business with the said the Independent Glass Company, during the period provided for in said contract, to-wit, up to and including the first day of May, 1916."

A judgment and decree restraining the defendant from further acts in violation of the terms of the contract was accordingly entered.    To review which defendant brings the case here on error.

The main question is whether that part of the contract wherein and whereby the defendant agreed and undertook not to engage in the glass business within this state for a period of ten years, is void as being in restraint of trade, and thus against public policy.    The defendant contends that it is, and predicates error on the fact that the court below held a contrary view.

That one may lawfully covenant to refrain from pursuing a particular business within the limits of a certain territory, even if it be an entire state, if the restraint thereby enjoined is reasonable and affords only a fair protection to the one in whose favor it is imposed, is no longer an open question. The following general rules applicable to contracts of this character are found in Eddy on Combinations, sec. 688 et seq.:

"It will be found that in the earlier days contracts in restraint of trade were looked upon with great disfavor by the courts. The attitude of the courts in this respect has greatly changed, and the most enlightened tribunals not only consider contracts in restraint of trade with favor, but look upon them as essential to the well being and progress of the community. It is not seldom, however, that even now the courts, carried away by the earlier decisions, arbitrarily pronounce contracts, which as a matter of fact appear entirely reasonable under all the circumstances, to be void, not so much because they are unreasonable as because they seem contrary to some earlier authorities.

Contracts in restraint of trade should be interpreted in the light of the following propositions:

(a)  The right to contract is fundamental to all social organization.

(b)  Good-will is property, and as such is subject to transfer like any other species of property; and in its enjoyment the purchaser is entitled to exactly the same measure of protection that is afforded the purchaser of tangible property; the law should not permit the vendor to regain possession, contrary to the terms of his agreement, of all or any part of that which he has sold.

(c)  All contracts made for the protection of the purchaser of good-will should be strictly enforced, unless it clearly appears that they are so unreasonable in their terms as to deprive the vendor or the party bound of valuable rights, without any corresponding benefit to the purchaser; even under such conditions a contract should be enforced wherever it is possible to so divide it as to declare it binding over such territory and for such time as are reasonably necessary for the protection of the purchaser, and declare it void as to such time and such territory as are not necessary for the protection of the purchaser. It will be found that it is occasionally possible for courts to hold the contract divisible in this respect.

(d)   A contract in restraint of trade being the contract by which the good-will of a profession, trade of calling, or of a business or enterprise, is sold, the courts should look with favor upon such contracts and enforce them, except in those cases where the enforcement would be manifestly inequitable and amount to the enforcing of a contract that is void for want of consideration.

(e)   The consideration for a contract in restraint of trade being that which is paid for the good-will of the profession, trade, calling, business or enterprise in question, it is obvious that the entire consideration is met by the transfer of the entire good-will, and any agreement which arbitrarily binds the vendor beyond the territory and the time necessary for the protection of the good-will transferred is without consideration."

And in Hammon on Contracts, at sec. 244a, the rule respecting agreements of the kind under consideration is thus clearly stated:

"In reference to time and place, while it has always been held in the American states that a promise not to engage in a particular business within reasonable limits within the state is valid, even though the duration of the agreement is unlimited, the doctrine of a few of the earlier cases was that a promise not to carry on a particular business at any place within the state was illegal *per se,* because it would compel the promisor to transfer his residence and allegiance to another state in order to pursue his vocation. This reasoning, however, was hardly applicable to the several states of the Union, which form one entire nation, and, except in a few states, the doctrine no longer prevails, and, accordingly, the validity of a stipulation not to carry on a trade within the state ordinarily depends upon whether it is reasonably necessary for the protection of the promisee. If it is, it is lawful; otherwise, not. Some courts, applying the same principle, hold that an agreement in restraint of trade may be valid, even though it is general as to space, if the promisee requires its enforcement to

protect him.   This doctrine is the logical result of the conditions of modern trade.

As generally·laid down, the rule is that an agreement in restraint of trade is valid if the restriction does not go, as to its extent in space or otherwise, beyond what, in the judgment of the court, is reasonably necessary for the protection of the promisee, regard being had to the nature of the trade or business."

The bare fact that the restraint is applied to an entire state, or even to a wider territory, is not of itself sufficient to condemn and nullify a contract of this sort.   The public welfare is the first consideration, and if it be not adversely affected thereby, the contract should be sustained, if it is reasonable, and imposes upon the party bound no greater restraint than is necessary for the fair protection, within the plain purpose and meaning of the contract, of the party for whom protection is intended.   Such now is practically the unisersal criterion by which contracts of this character are to be adjudged; that is, the question of whether the contract, under the circumstances of each particular case, is reasonable or unreasonable is the controlling factor.

In Beach on Modern Law of Contracts, secs. 1569, 1575, the following is stated:

"The tendency of modern thought and decisions has been no longer to uphold in its strictness the doctrine which formerly prevailed respecting agreements in restraint of trade. The severity with which such agreements were treated in the beginning has relaxed more and more by exceptions and qualifications, and a gradual change has taken place, brought about by the growth of industrial activities, and the enlargement of commercial facilities which tend to render such agreements less dangerous, because monopolies are less easy of accomplishment.   Whether the restraint be general or partial is no longer considered a material question.   *   *   *

The modern doctrine is well-nigh universal that when one engaged in any business or occupation sells out his stock in trade and good-will or his professional practice he may contract with the purchaser and bind himself not to engage in the same vocation in the same locality for a time named and he may be enjoined from violating this contract.  *  *  *."

The following authorities, with many others, announce the law to be as stated in the foregoing quotations, and uphold the doctrine that whether the restraint is general or partial, widely extended or narrowly limited, is in and of itself alone immaterial:  *Harrison v. Glucose Sugar Refining Co.,* 116 Fed. 304; *Anchor Electric Company v. Hawkes,* 171 Mass. 101; *Bancroft v. Union Embossing Co.,* 72 N. H. 402; *Beal v. Chase,* 31 Mich. 490; *Diamond Match Co. v. Roeber,* 106 N. Y. 473; *Fisheries' Company v. Lennen,* 116 Fed. 217; *Oregon Steam Navigation Co. v. Winsor,* 87 U. S. 64; *Trenton Potteries Co. v. Oliphant,* 58 N. J. Eq. 507; *Swigert v. Tilden,* 121 Ia. 650; *Oakdale Manufacturing Co. v. Garst,* 18 R. I. 484; *National Benefit Co. v. Union Hospital Co.,* 45 Minn. 272; *Gibbs v. Baltimore Gas. Co.* 130 U. S. 396; *National Enameling & Stamping Co. v. Haberman,* 120 Fed. 415; *Wood v. Whitehead,* 165 N. Y. 545.

But we are not without authority in our own state upon the precise question under consideration.  In *Freudenthal v. Espey,* reported in 45 Colorado at page 489, the law respecting such contracts, from its incipiency in the early English cases to the present, is reviewed, analyzed and applied.  In the light of that decision it is unnecessary to enter upon a more exhaustive discussion to ascertain the rule in this jurisdiction applicable to the contract in question, for the doctrine is stated so plainly in that case that we have but to examine the conditions of this one and apply the rule there announced to them, since each case is to be resolved on its own particular facts. —*Harrison v. Glucose Sugar Refining Co., supra; Oregon Steam Navigation Co. v. Winsor, supra; Alger v. Thacher, supra.*  In *Freudenthal v. Espey, supra,* both parties were

physicians; the defendant, a young practitioner, agreed not to enter "the practice of medicine, surgery or obstetrics, or the branches of either, in the city of Trinidad," either directly or indirectly, "for the full period of five years," if within that time he should quit the employment of the plaintiff, an old practitioner, to whom he was bound by contract as a stated salary for that period; there was a sufficient consideration; the defendant left the employment of the plaintiff before he was entitled to, and immediately engaged in and continued the practice of medicine at Trinidad contrary to his agreement not to do so. Upon suit by plaintiff for damages for such breach, and injunctive relief, defendant relied upon the invalidity of the restrictive covenant in the contract as a defense. At page 493 it was there said:

"Expanding commercialism, advancing science and arts, the desire and necessity for education, and the spirit of the age, however, eventually impressed the judicial mind with the necessity of remodeling the rule to meet the needs and requirements of men. It was recognized that both public interest and private welfare often render engagements not to carry on a trade or to act in a profession in a particular place for a limited time, proper and even beneficial.—*Mallan v. May,* 11 M. & W. 653; *Homer v. Ashford,* 3 Bing. 326; *Herreshoff v. Boutineau,* 17 R. I. 3.

Thus impressed the courts sought to meet such requirements by first fusing into the law a distinction between sealed instruments and simple contracts. This distinction being without reason, and not founded upon principle, soon disappeared, and the more logical distinction between general and limited restraint of trade grew and found favor with the courts. The latter distinction appeared as early as *Broad v. Jollyffe,* Cro. Jac. 596, in which it was held that a contract not to use a certain trade in a particular place, was an exception to the general rule, and not void. The seed thus sown did not fully fructify, however, until the leading case of *Mitchell v. Reynolds,* 1 P. Wms. 181, by which the attempted distinction between

sealed contracts in restraint of trade, and those not under seal was abrogated, and the distinction between general and limited restraints, or rather the true distinction, to-wit, between unreasonable and reasonable restraints was fully established."

And again at page 502 this is declared:

"Agreements like this must be construed with reference to the objects sought to be obtained by them. The object here is the protection of one of the parties against competition in his profession. The nature of the business to protect was a medical practice, extending far beyond the limits of the city of Trinidad; that the covenantee possessed this business, and the knowledge and the skill that enabled him to acquire it. Certainly in limiting the restriction to the city of Trinidad and for the period of five years was only affording 'a fair protection to the interests of the party in favor of whom it is given, and not so large as to interfere with the interests of the public.' The restraint was no larger than the needs of the covenantee required. It was of material benefit to him, and was not oppressive on the covenantor, nor was it in any sense injurious to the public. The contract is in no wise forbidden by any principle of policy or law. The defendant can be as useful to the public at any other place as at Trinidad, and the interests of the community, elsewhere, are as important as they are there."

And in that case the court approves the rule as stated in *Horner v. Graves,* 7 Bing. 743, in the following quotation:

" 'We do not see how a better test can be applied to the question whether reasonable or not than by considering whether the restraint is such only as to afford a fair protection to the interests of the party in favor of whom it is given, and not so large as to interfere with the interests of the public. Whatever restraint is larger than the necessary protection of the party, can be of no benefit to either; it can only be oppressive; and, if oppressive, it is in the eye of the law unreasonable. Whatever is injurious to the interests of the public, is void on the ground of public policy.' "

While it is true that in the *Freudenthal* case the precise facts found in the case at bar were not present, still in so far as an application of the law be concerned, there is no essential difference between them.  The *Freudenthal* case brought up for the first time in this state a direct consideration of contracts in restraint of trade, and it became necessary to examine and analyze the cases on this subject, both ancient and modern, and to note the history and development of the law on the subject, and the growth of the modern as distinguished from the ancient rule, so that the one best adapted to present needs should be approved for this commonwealth, with the result that the doctrine of the *Freudenthal case,* as indicated by the foregoing quotations from that opinion, respecting such contracts, is the one to which we are committed.

*Alger v. Thacher,* 19 Pick. 51; *Tuscaloosa Ice Manufacturing Co. v. Williams,* 127 Ala. 110; *and Consumers' Oil Co. v. Nunnemaker,* 142 Ind. 560, are relied upon by plaintiffs in error as upholding a contrary doctrine to that here announced, and requiring a reversal of the judgment.  A careful examination of the decisions in these cases show that in none of them is the rule which we adopt denied or modified.  The restraint attempted was found to be unreasonable, upon the facts of each of those cases, and they are therefore practically in accord with our views.  The Illinois and California cases, *Lanzit v. Sefton Manf. Co.,* 184 Ill. 326; *Union Strawboard Co. v. Bonfield,* 193 Ill. 420; *Wright v. Ryder,* 36 Cal. 342; and *More v. Bonnett,* 40 Cal. 251, may fairly be said to announce a different rule; but they stand substantially alone, and we are not disposed to approve or follow them.

Upon the contention that the contract was the result of a conspiracy to create a monopoly, the facts show that the three companies to the contract operated in practically the same field, throughout Colorado and in neighboring states.  Mr. Barrows testified that the business of the Denver Plate Glass Company, at the time of sale, extended over Montana, Idaho, Wyoming, Nebraska, South Dakota, Kansas, Colorado, New Mexico,

Texas, Arizona and Utah. It is clear from the uncontroverted testimony of several witnesses that no monopoly could or did result from the contract in question; that there were many dealers in glass in Denver and that competition was sharp. The witness Mineheart said:

"Q.   I wish you would state to the court in your own way what the situation was in the city of Denver and what it was after May, 1906, with reference to whether the McPhee & McGinnity Company and the McMurtry Manufacturing Company had any monopoly?

A.   The McPhee & McGinnity Company carry a large stock of plate glass. The McMurtry Manufacturing Company also carries plate glass. The Independent Glass Company carries plate glass, and prior the Denver Plate Glass Company carried plate glass. After we took over the Denver Plate Glass Company, this company, the Denver Plate & Window Company, was formed, for the purpose of winding up and disposing of the stock that was taken from the Denver Plate Glass Company; also the Hallack & Howard Lumber Company, and the H. W. Bingham Lumber Company. The Salzer Lumber Company, the Fleming Bros., and perhaps a dozen other people took contracts for glass and buy it from St. Louis, Kansas City and Omaha. The market in Denver is by no means closed. It is a physical impossibility to make any arrangement of that kind. The competition in the glass business in Denver in the last eight and a half years, since I have been here, and the competition throughout the country has been fierce; the history of the glass business has never seen the state of affairs that has existed in the past three years."

McMurtry and McPhee, as well as Williams, a witness for defendant, testified to the same effect. The testimony shows conclusively that the glass business was in a demoralized condition, in Denver and throughout the state, prior to the sale, as a result of the unbusinesslike policy of the defendant in carrying on the affairs of the Denver Plate Glass Com-

pany; that it was impossible at that time to make a fair or reasonable profit from the business at all.

In cases where a claim of this sort is made the courts will make most careful and diligent inquiry to ascertain whether there is any encroachment on the public welfare. The law looks with high disfavor upon any condition which tends to stifle the free and unimpeded course of competitive buying and selling in the open market of commodities which are necessities, and contribute to the general comfort and well being of humanity. But it is not a judicial province to presuppose that such a condition exists, when as matter of fact it does not. It is sufficient to say, upon this branch of the case, that the testimony introduced by defendant, in support of the contention that the contract tended to create a monopoly, considered in the most favorable light for that purpose, utterly fails to establish that such was its effect. The selling schedule adopted by the plaintiff companies, after purchasing the stock of defendant under contract, showed an advance over the price at which sales had been made before the purchase, and this was strongly relied upon to prove that the securing of the contract was part of a collusive and fraudulent scheme to create a monopoly. This alone is not sufficient to prove such claim. The single fact that the plaintiffs raised the price of glass after purchasing the Denver Plate Glass Company's stock and good-will, as well as the good-will of the defendant, does not show an intent even to create a monopoly, much less that one was in fact created; more especially is this true where the testimony discloses that the defendant had by his business policy, prior to the time of sale, completely demoralized the glass market and fixed prices that were ruinous to the trade. If the prices quoted after the purchase were exhorbitant, and tended to show the existence of a monopoly, that could be best made to appear by a comparison with the prices at which other dealers in glass generally throughout the territory had been and were selling it, and the effect of the new quotations upon the general market, rather than by a comparison with the cut prices at

which the plaintiffs and defendant themselves had handled it just prior to the purchase of the business of defendant. The fact that, through organizing the Independent Glass Company only a short time after he had disposed of his stock in trade and good-will to the plaintiffs, the defendant engaged in that line again, is in and of itself alone a complete refutation of his contention that a monopoly had been effected. At most, only one competitor was removed by the purchase, and its tendency to create a monopoly is too remote for serious consideration. In a case like this, from a trade standpoint, the interests of the public was practically unaffected by such purchase. There simply has been the substitution of one tradesman for another. The plaintiffs had no control over the supply, numerous other competitors remained, fresh capital was entirely free to enter the field, and would certainly have done so had prices been held unreasonably high. No other concerns were purchased, and, as shown by the testimony, there were many dealers in the field competing for business. The plaintiffs themselves were *bona fide* competitors, as were also eastern jobbers. The field was open to all comers, and there is little or no danger that the public will suffer from lack of persons to engage in a profitable business. Under the conditions shown to exist, it was impossible to create a monopoly through the contract in question; it neither did or could confer a special or exclusive privilege. To hold that the purchase of a single business, in a wide field occupied by numerous competitors and open to all who might desire to engage in that business, is invalid, as tending to create a monopoly, would be to prohibit the purchase by any merchant of the stock in trade and good-will of another, carrying on a like business in the same place, and and would be utterly inconsistent with a free exercise of the right of contract.

The plain truth is that the defendant was carrying on an unbusinesslike warfare, it may be for the express purpose of compelling some one to buy him out. It was entirely proper, under the facts of this case, for the plaintiffs to do so, since

the defendant persisted in the employment of unfair methods in the conduct of his business. While it is doubtless true that competition is the life of trade, it is also equally true that competition of a certain sort almost inevitably leads to disaster, not alone to those immediately concerned, but to the public as well. It is safe to say that the general welfare is best served by healthy competition, which allows business enterprise, when conducted with energy and skill, to gather fair returns upon the ability, industry and capital employed. While ruinous competition, which demoralizes an industry and business, and prevents reasonable returns on the investment, may sometimes bring temporary gain to the public, must, in the very nature of things, finally result in general and permanent loss and disaster. The record wholly fails to support the claim of defendant, that the contract in question either did or could create for the plaintiffs a monopoly of the business under consideration.

Neither is the contention that the contract was executed by the defendant under duress, and therefore not binding, well founded. The testimony that threats were made against him by certain members of the plaintiff companies a month or so prior to the execution of the contract is flatly denied. It is manifest that even if such threats were made, they had little if any effect upon the defendant, for almost immediately after the sale, having received full consideration for his business and good-will, he re-engaged in the same line from which, as is claimed, such threats had driven him. From all of the testimony the conclusion is irresistible that the contract was voluntarily executed for the express purpose of consummating a sale, which upon the record showing was highly advantageous to the defendant, and out of which he secured a large price for his stock in trade, together with twenty-five hundred dollars cash additional for the good-will of the business.

It may not be amiss to here suggest that there can be no sound and wholesome public policy, which operates in the slightest degree to lend approval to the open disregard and violation of personal contracts entered into in good faith, upon

good consideration. It is quite as important, as a matter of public interest and welfare, that individuals be not allowed, with impunity, to transgress their solemn undertakings, advisedly entered upon, as it is that the public have protection in other respects. Where one is so lost to a sense of moral obligation as to accept a full consideration for his stock in trade and good-will, upon express condition that he refrain from again entering that business for a limited time, within a certain territory, and then immediately, having pocketed the fruits of the agreement, deliberately and wilfully ignores the controlling condition thereof, courts should certainly not hunt for legal excuse to uphold him in such moral delinquency. On the contrary, in the interests of the general public, and to discourage bad faith conduct of that sort, wherever, without violation of legal principles and public policy, it may be done, contracts like the one under discussion should be rigidly upheld and enforced. A recent expression of the English court of appeals on this subject, in *Underwood v. Barber,* 68 L. J. Ch. Div. 201, meets with our cordial approval, and is as follows:

"If there is one thing more than another which is essential to the trade and commerce of this country, it is the inviolability of contracts deliberately entered into; and to allow a person of mature age, and not imposed upon, to enter into a contract, to obtain the benefit of it, and then to repudiate it and the obligations which he has undertaken, is *prima facie* at all events, contrary to the interests of any and every country."

To like effect are *Casserleigh v. Wood,* 14 Colo. App. 265, and *Swigert v. Tilden, supra.*

The conclusions announced in this opinion have been reached by the court upon a full, careful and independent examination and consideration of the testimony brought up and the complete record in the case. Fortunately, however, it appears that the honorable trial judge, who met the witnesses face to face, heard them under oath, observed their demeanor on the stand, marked any and all conflict of testimony, made full and explicit findings, all amply supported by evidence, al-

though it may well be that on some points there was conflicting testimony, in harmony with the views we sustain. The result and effect of those findings were to establish: First. That plaintiffs below had no intention or purpose of obtaining a monopoly and obtained none; Second. That the restrictive clause of which complaint is made was reasonable and necessary to the fair protection of the plaintiffs in the enjoyment of the business and good-will purchased by them, and was in no sense contrary to public policy; Third. That the defendant executed the agreement freely, and received a good and adequate consideration therefor; and Fourth. That the plaintiffs have never at any time waived any right under the restrictive clause of the agreement, the terms of which the defendant had violated and was continuing to violate.

It is manifest, on principle, authority and public policy, that the agreement entered into between the defendant and plaintiffs should be given full effect, according to its very terms; and it is also equally plain that both the law and the facts abundantly support the findings of the court below and the judgment and decree entered.

Every person must pay the penalty for the wrong he does. The defendant is no exception to the rule. The law of compensation is fixed and certain. The defendant has wilfully violated and ignored the terms of a lawful contract, entered into in consideration of a large sum of money paid him, which he retains. By these acts he has committed a wrong and must pay the price. It was so adjudged and decreed by the trial court, and that judgment and decree meets our sanction and approval.                    *Judgment affirmed.*

CHIEF JUSTICE MUSSER and Mr. JUSTICE GARRIGUES concur.