Ollette OMEDELENA, Plaintiff–Appellee,

v.

DENVER OPTIONS, INC., a Colorado nonprofit corporation; and Bethphage, Inc., a Nebraska corporation, Defendants–Appellants.

No. 00CA1640.

Colorado Court of Appeals,
Div. IV.

March 14, 2002.

Certiorari Denied Jan. 13, 2003.*

---

* Justice RICE would grant as to the following issues:

Whether the court of appeals erred in holding that respondent's pecuniary interest in a private contract outweighs Denver Options' statutory and regulatory duties to prtect persons with developmental disabilities from neglect.

Whether the court of appeals erred in holding that Denver Options did not have a contractual right as a matter of law to refuse to fund respondent's contracts after charges of neglect against her had been substantiated.

Leslie A. Petri, Law Office of J. Mark Baird, LLC, J. Mark Baird, Kimberly L. Johnson, Denver, CO, for Plaintiff–Appellee.

Kennedy & Christopher, P.C., Michael T. Mihm, John R. Mann, Denver, CO, for Defendant–Appellant Denver Options, Inc.

Inman Flynn & Biesterfeld, P.C., Richard P. Brentlinger, Robert J. Thomas, Denver, CO, for Defendant–Appellant Bethphage, Inc.

Hale Hackstaff Tymkovich & ErkenBrack, LLP, Richard A. Westfall, Denver, CO, for Amicus Curiae Colorado Association of Community Centered Boards.

Opinion by Judge TAUBMAN.

Defendants, Denver Options, Inc., and Bethphage, Inc., appeal the judgment entered on a jury verdict in favor of plaintiff, Ollette Omedelena, on her claims of intentional interference with contractual relations and prospective economic advantage. We affirm.

Omedelena is a host home provider. As a host home provider, she cared for two developmentally disabled persons, J.C. and R.M., both severely mentally retarded. Omedelena cared for the two women in her home for almost ten years under a series of contracts with different service agencies.

Bethphage, a nonprofit corporation, is a service agency. Services agencies, defined in § 27–10.5–102(28), C.R.S.2001, subcontract with people like Omedelena who provide support for developmentally disabled persons in their home. Bethphage in turn receives its funding from community centered boards.

Denver Options, a nonprofit corporation, is a community centered board. Community centered boards enable persons with developmental disabilities to live in residential settings that reflect typical patterns of everyday living, rather than being housed in institutions. They contract with the Colorado Department of Human Services (Department) to arrange for the provision of services for persons with developmental disabilities. Funding for community centered boards comes from various state and local sources, as well as private donations. Denver Options contracts with thirty-four service agencies that provide adult services and seventy-five agencies that provide services to children.

This conflict arose on June 9, 1998, when two Bethphage employees and a Department inspector conducted a survey for R.M. A survey is an inspection to ensure that developmentally disabled persons are receiving proper care. This survey took place at a beauty parlor where Omedelena had taken J.C. and R.M. for a haircut. When the inspector arrived, he found J.C. sitting alone, outside the beauty parlor, in Omedelena's van. After asking Omedelena why J.C. was not being supervised, he noted the incident in his survey report and advised Bethphage that the incident should be investigated as neglect.

On June 13, 1998, Omedelena notified Bethphage that she did not intend to renew her contract with Bethphage and that she intended to contract with another service agency, Innovative Training and Development Services (ITDS), to provide services for J.C. and R.M.

Although Bethphage is required to file a report within twenty-four hours of an incident, it did not file an incident report related to the June 9 incident until June 16, 1999.

On July 7, 1998, Omedelena, employees from Bethphage and Denver Options, R.M.,

J.C., and J.C.'s legal guardian attended an interdisciplinary team meeting. At this meeting, the team discussed Omedelena's desire to contract with another service agency, as well as the June 9 incident. The team approved Omedelena's transfer to another service agency, with her continuing to care for J.C. and R.M.

On July 9, 1998, Omedelena entered into a contract with ITDS, funded by a contract between Denver Options and ITDS, to provide services to J.C. and R.M. These contracts were to become effective on July 13, 1998.

On July 10, 1998, Bethphage was informed by the Denver Options employee investigating the June 9 incident that there would likely be a finding of neglect against Omedelena. Bethphage decided, that day, the last business day before Omedelena's contract with ITDS was to take effect, to remove J.C. and R.M. from Omedelena's home. Denver Options also decided that day to delay the funding of its contract with ITDS.

However, when Denver Options and Bethphage attempted to contact Omedelena on July 10, they could not find her, J.C., or R.M. The three had left for vacation and did not return until July 17. Omedelena had notified her Bethphage supervisor about the trip, but she had not discussed the vacation with J.C.'s legal guardian, as she had in the past, or left any contact information with Denver Options or Bethphage. Because Denver Options and Bethphage were unable to contact Omedelena, even after leaving several messages with her son, they notified the police that J.C. and R.M. were missing.

Denver Options permanently terminated funding of its contract with ITDS on July 13, 1998. As a result, ITDS rescinded its contracts with Omedelena pursuant to a funding availability clause. When Omedelena returned with J.C. and R.M., they were removed from her home and placed with another host home provider.

Omedelena filed this suit against both Denver Options and Bethphage, asserting claims including intentional interference with contractual relations and intentional interference with prospective economic advantage. Ome-

delena alleged that Bethphage's and Denver Options' purported reason for removing J.C. and R.M. from her care and terminating the ITDS contract—to protect J.C. and R.M. from neglect—was a mere pretense to prevent her from contracting with ITDS and to protect their own economic self-interest.

Both Denver Options and Bethphage filed motions for summary judgment, which the trial court denied. At trial, Denver Options and Bethphage moved for directed verdicts. Relying on Restatement (Second) of Torts § 770 (1979), Denver Options asserted that it was privileged to interfere with a contract or prospective economic advantage because it was acting to protect the welfare of J.C. and R.M. when it denied funding to ITDS. Bethphage joined Denver Options in this motion and also argued that it could not have interfered with Omedelena's contracts because it did not control any funding for her. The trial court denied both motions. The jury awarded Omedelena economic, noneconomic, and punitive damages.

### I. Absolute Statutory Right to Prohibit Neglect

Denver Options and Bethphage contend the trial court improperly denied their motions for directed verdict because they have an absolute statutory right to prohibit neglect and that, therefore, their interference with ITDS's contract with Omedelena was not improper. We disagree.

■ The tort of intentional interference with contractual relations is committed when one intentionally and improperly interferes with the performance of a contract between another person and a third person by inducing or otherwise causing the third person not to perform the contract. *Westfield Dev. Co. v. Rifle Inv. Assoc.*, 786 P.2d 1112 (Colo. 1990).

In *Memorial Gardens, Inc. v. Olympian Sales & Management Consultants, Inc.*, 690 P.2d 207 (Colo.1984), the supreme court followed Restatement (Second) of Torts §§ 767 and 768 (1979) to determine whether interference is improper. The court stated that the term "improper" requires courts to examine the factors listed in § 767, which in-

clude the interests of the parties and those of society, before determining whether a person's intentional interference with a contract is actionable.

■ Generally, tortious interference with contractual rights must involve a wrongful act or a legal act performed in an unlawful manner. *Int'l Ass'n of Machinists v. Southard*, 170 Colo. 119, 459 P.2d 570 (1969).

No liability attaches, however, where the act alleged to have caused the breach was undertaken in the exercise of an absolute right, that being conduct which the actor has a definite legal right to engage in without qualification. *Radiology Prof'l Corp. v. Trinidad Area Health Ass'n*, 39 Colo.App. 100, 565 P.2d 952 (1977), *aff'd*, 195 Colo. 253, 577 P.2d 748 (1978).

In *Radiology*, a division of this court noted that the boundaries of absolute right and qualified justification have not been firmly established. It also observed that absolute rights had been established concerning such interests as property ownership, contractual entitlement, and freedom of contract. Further, the division stated that an absolute right may be exercised without liability regardless of motivation, while qualified justification requires a fact finder to determine, after balancing conflicting interests, whether an alleged interference was warranted.

Colorado also recognizes a cause of action for tortious interference with prospective business or economic advantage. *See Amoco Oil Co. v. Ervin*, 908 P.2d 493 (Colo.1995). A division of this court has applied Restatement (Second) of Torts § 768 to this tort. *Dolton v. Capitol Fed. Sav. & Loan Ass'n*, 642 P.2d 21 (Colo.App.1981).

■ While an underlying contract is not required for this tort, there must be a showing of improper and intentional interference by the defendant that prevented the formation of a contract between the plaintiff and a third party. *Wasalco, Inc. v. El Paso County*, 689 P.2d 730 (Colo.App.1984).

■ In evaluating motions for directed verdict, we must determine whether there is any evidence of sufficient probative force to support the trial court's findings. A review-

ing court considers all evidence in the light most favorable to the party against whom the motion is directed and indulges every reasonable inference that can be legitimately drawn from the evidence in that party's favor. However, when the relevant facts are undisputed, an appellate court may make an independent determination of any legal question. *Evans v. Webster,* 832 P.2d 951 (Colo.App. 1991). Here, because there are no facts in dispute on this issue, we review de novo defendants' absolute statutory right contention.

### A. Denver Options' Statutory Contention

Denver Options argues that, because it had an absolute right to prohibit neglect under applicable statutes and regulations, it had an absolute legal right to deny funding to ITDS for Omedelena's services. We disagree.

Denver Options and Bethphage are regulated by a comprehensive statutory scheme concerning the care and treatment of the developmentally disabled. Section 27–10.5–101, et seq., C.R.S.2001. A service agency and a community centered board acting as a service agency must comply with all statutory requirements establishing the standard of care for developmentally disabled persons. Section 27–10.5–104(2), C.R.S.2001. "All service agencies shall prohibit mistreatment, exploitation, neglect, or abuse in any form of any person receiving services." Section 27–10.5–115(2), C.R.S.2001.

To determine whether Denver Options had an absolute right to act without qualification, we examine the above statutes using familiar rules of statutory construction. When the General Assembly enacts a statute, it is presumed that a just and reasonable result is intended and that the public interest is favored over any private interest. Section 2–4–201(1)(c), (e), C.R.S.2001. Additionally, statutes must be construed to carry out their beneficent purposes. *Seibel v. Colo. Real Estate Comm'n,* 34 Colo.App. 415, 530 P.2d 1290 (1974). Further, statutes should be construed as a whole to give consistent, harmonious, and sensible effect to all their parts. *In re Marriage of Davisson,* 797 P.2d 809 (Colo.App.1990).

We consider the statutory provisions upon which Denver Options relies in light of the legislative declaration for article 10.5(1). That declaration provides, in relevant part, that the statutory provisions for the care and treatment of the developmentally disabled are intended:

(a) To provide appropriate services and supports to persons with developmental disabilities throughout their lifetimes regardless of their age or degree of disability;

(b) To prohibit deprivation of liberty of persons with developmental disabilities, except when such deprivation is for the purpose of providing services and supports which constitute the least restrictive available alternative adequate to meet the person's needs, and to ensure that these services and supports afford due process protections;

. . .

(d) To ensure the provision of services and supports to all persons with developmental disabilities on a statewide basis;

. . .

(f) To provide community services and supports for persons with developmental disabilities which reflect typical patterns of everyday living; [and]

. . .

(h) To ensure that persons with developmental disabilities receive services and supports which encourage and build on existing social networks and natural sources of support, and result in increased interdependence, contribution, and inclusion in community life.

Section 27–10.5–101(1), C.R.S.2001.

Article 10.5 provides for a complex set of relationships among community centered boards, service agencies, and, in some cases, host home providers, to provide services and support to persons with developmental disabilities. Although § 27–10.5–115(2) directs service agencies to prohibit mistreatment, exploitation, neglect, or abuse, such directive is in the context of a statute which requires service agencies to provide humane care and treatment to persons with developmental disabilities. There is no express statutory pro-

vision which specifically entitles either a community centered board or a service agency to terminate funding to a host home provider under the circumstances presented here.

■ We note that Denver Options has not cited any case in which a claim of intentional interference with contract relations or prospective economic advantage has been based on a party's absolute right to act based on a particular statute. Our research has not revealed any such case, and we decline to conclude that article 10.5 provides an absolute right for Denver Options to terminate Omedelena's contract. Even if we were to assume that a statute could provide a party an absolute right to interfere with an existing or prospective contract, we conclude such statutory right must be narrowly tailored to focus on the particular circumstances presented. The statute here is not so specific.

We also conclude that the regulations upon which Denver Options and Bethphage rely do not afford them an absolute right to interfere with existing or prospective contracts. As with the statutes, the applicable regulations establish a detailed scheme for regulating the conduct of community centered boards, service agencies, persons with developmental disabilities, and others. The regulations relevant here stated that they were intended to:

> establish requirements for providing appropriate and quality services and supports for persons with developmental disabilities and their families.... These rules are designed to assist and guide the provision of services and supports within the best practices known to the Department, encourage best practices within and between the community centered boards, service agencies and regional centers, and to protect persons with disabilities from abuse, mistreatment, neglect and exploitation. These rules also establish a system which provides *fair and equitable due process in resolution of conflicts* between the various constituent groups that are subject to these regulations.

Dep't of Human Services Reg. (Purpose), 2 Code Colo. Regs. 503–1 (1995)(repealed Jan. 10, 2001)(emphasis added).

The goal of assuring due process in resolving conflicts among the various constituent groups set forth in this regulation is inconsistent with Denver Options' contention that it may act unilaterally based upon an absolute right to terminate Omedelena's contract. Indeed, the regulations provide detailed procedures for resolving contract disputes between community centered boards and service agencies. Dep't of Human Services Regs. 16.323, 2 Code Colo. Regs. 503–1 (2001)(similar version formerly codified as Reg. 7.3 (1995)); *see also* Dep't of Human Services Reg. 16.560 (similar version formerly codified as Reg. 10.6 (1995))(incident reporting); Dep't of Human Services Reg. 16.624 (formerly codified as Reg. 12.3 (1995)) (specifications for the provision of services and supports through host home providers).

Significantly, although two regulations authorize emergency action to protect a person with developmental disabilities, neither authorizes Denver Options to interfere with an existing or prospective contract of a host home provider. *See* Dep't of Human Services Reg. 16.312(A)(5), 2 Code Colo. Regs. 503–1 (2001)(formerly codified as Reg. 6.2.1.5 (1995))(emergency action may be taken by a developmental disabilities professional, including a person designated by the director of a community centered board or service agency, to suspend the rights of the developmentally disabled person if such action is "imminently necessary to protect the health and safety of the person, others, or property"); Dep't of Human Services Reg. 16.323(C) (formerly codified as Reg. 7.3.3 (1995))(during contract dispute between community centered board and service agency, the community centered board shall honor all contractual obligations; no agency shall have its contract terminated pending resolution of a contractual dispute unless necessary for preservation of public health, safety, or welfare).

Further, Denver Options is governed by Department regulations that require community centered boards to be responsible for monitoring the services and support provided to developmentally disabled people. Dep't of Human Services Reg. 16.460, 2 Code Colo. Regs. 503–1 (2001)(formerly codified as Reg. 5.6.1 (1995)). These regulations mandate that community centered boards provide a

procedure for reporting, reviewing, and investigating all allegations of abuse, mistreatment, and neglect in order to ensure prompt action to protect the safety of developmentally disabled persons and that appropriate legal recourse is taken against employees who have engaged in such conduct. Dep't of Human Services Reg. 16.580 (formerly codified as Reg. 10.9.2 (1995)).

Although these regulations detail the procedures that may be taken by community centered boards, service agencies, and others in cases of suspected abuse or neglect, they do not authorize such entities to interfere unilaterally with existing or prospective contracts.

Accordingly, we conclude that the trial court properly denied Denver Options' motion for directed verdict based upon its asserted absolute right to prohibit neglect under applicable statutes and regulations.

### B.  Bethphage's Statutory Contention

■ Similarly, Bethphage contends that because it has a statutory duty to ensure the safety of developmentally disabled persons and to report any instances of neglect, abuse, or mistreatment, it had an unqualified right to remove J.C. and R.M. from Omedelena's care, and therefore its conduct was not improper. We are not persuaded.

As discussed above, the applicable statutes and regulations do not give a service agency an absolute right to remove a developmentally disabled person from a host home provider even if an allegation of neglect has been substantiated.

Because Bethphage did not have an unqualified statutory or regulatory right to remove J.C. and R.M. from Omedelena's care, the trial court properly denied its motion for directed verdict.

### C.  Policy Considerations

In concluding that neither Denver Options nor Bethphage had an absolute statutory right to act, we are mindful of the concerns raised by defendants and amicus as to the important role played by community centered boards and service agencies. Those entities are uniquely situated to protect people with developmental disabilities and to ensure the fullest measure of their privacy, dignity, rights, and privileges. *See* § 27–10.5–101. For example, the Department's regulations provide that an agency may (1) terminate a contract if necessary for the preservation of public health, safety, or welfare as determined pursuant to § 16.325, Dep't of Human Services Reg. 16.323(C); (2) take emergency action and suspend a developmentally disabled person's rights if imminently necessary to protect the health and safety of the person, others, or property by using the least intrusive means, Dep't of Human Services Reg. 16.312(A)(5); and (3) remove a developmentally disabled person or replace staff if the agency determines the action is necessary and appropriate, Dep't of Human Services Reg. 16.580(B)(8).

Nevertheless, such entities should not be insulated from liability if they misuse their power and responsibility to protect developmentally disabled persons. The mandate of community centered boards and service agencies to protect and care for people with developmental disabilities cannot eliminate the right of host home providers to be protected from the arbitrary action of such entities.

### II.  Absolute Contractual Right to Prohibit Neglect

Denver Options and Bethphage also argue the trial court erred in denying their motions for directed verdict because they have an absolute contractual right to interfere with Omedelena's contract relations or prospective economic advantage based on the language of their respective contracts. We are not persuaded.

Because there are no facts in dispute on this issue, we review de novo defendants' absolute contractual right contention. *See Evans v. Webster, supra,* 832 P.2d at 954.

### A.  Denver Options' Contract

Denver Options argues that it had an absolute right under its contract with ITDS to deny funding for Omedelena's services. We disagree.

Here, the contract between Denver Options and ITDS provided the following:

> ITDS shall avoid hiring applicants and/or utilizing volunteers who would have unsupervised contact with or access to persons receiving services or their property, and who have substantiated histories indicating abuse, neglect, or mistreatment of a child, adult, or person receiving services.

In addition, the contract provided that the executive director of Denver Options may

> [r]equest the removal from work on the contract of employee(s) and/or agent(s) of [ITDS] whom Denver Options justifies as being incompetent, careless, insubordinate, unsuitable, or otherwise unacceptable, or whose continued employment on the contract it deems to be contrary to the public interest or not in the best interests of Denver Options or the State.

Thus, based on the contract language, the executive director of Denver Options could request that ITDS remove a host home provider in two situations: (1) if Denver Options justifies that the host home provider is incompetent, careless, insubordinate, unsuitable, or otherwise unacceptable; or (2) if Denver Options deems that the host home provider's continued employment is contrary to the public interest or not in the best interests of the state.

█ Accordingly, the contract did not give Denver Options the unqualified right to deny funding. At most, Denver Options could request, not demand, that ITDS remove a host home provider under certain circumstances. Here, Denver Options did not request that ITDS remove Omedelena from the contract.

In addition, the contract only mandates that ITDS "shall avoid hiring" applicants or using volunteers who have substantiated histories indicating abuse, neglect, or mistreatment of a child, adult, or person receiving services.

Accordingly, in our view, this contract is not a contract of the type envisioned by the supreme court in *Radiology, supra,* where a contracting party has an unfettered legal right to act.

█ Indeed, Denver Options' contract is more similar to the contract in *Memorial Gardens, supra.* There, the supreme court addressed a claim of intentional interference with contract relations and analyzed a contract to determine if the competitors' privilege applied. Under the competitors' privilege, an actor may be immune from liability if he or she interferes with a contract that is terminable at will. *See* Restatement (Second) of Torts § 768. In concluding that the competitors' privilege did not apply there, the court stated:

> ·A contract terminable at will is one that may be terminated at any time without legal consequence; that is, there is no breach if the contract is terminated. The cancellation clause in the Memorial Gardens contracts does not allow the contract to be terminated with impunity; the clause provides for liquidated damages in the case of a breach. A liquidated damages clause is inconsistent with the existence of a contract terminable at will.

*Memorial Gardens, Inc. v. Olympian Sales & Mgt. Consultants, Inc., supra,* 690 P.2d at 212.

Similarly, we conclude that the "request removal" language in the contract here is inconsistent with an absolute right to act without qualification.

Finally, to the extent that Denver Options relies on *Lufti v. Brighton Community Hospital Ass'n,* 40 P.3d 51 (Colo.App.2001), we find that case distinguishable. The contract in *Lufti* provided that the defendants could remove the plaintiff physician from his employment at the hospital *at any time without any reason.* In this case, Denver Options may only request a service agency to remove a host home provider.

Nor do we agree with the amicus that Denver Options could terminate its contract with ITDS for any reason. Paragraph 30(b) of the contract provides that Denver Options may immediately cancel a contract, in its sole discretion, if it determines that the health, safety, or welfare of persons receiving services may be in jeopardy. Although this broad language gives Denver Options a measure of flexibility, it nevertheless requires that Denver Options determine that the

health, safety, or welfare of a developmentally disabled person may be in jeopardy. Even though the contract allows Denver Options to exercise its sole discretion, it must do so reasonably. *See, e.g., Steidtmann v. Koelbel & Co.,* 32 Colo.App. 94, 506 P.2d 1247 (1973). Whether it acted reasonably is a factual determination. A contractual clause that depends on a factual determination is inconsistent with an unequivocal legal right to act.

Therefore, we conclude that the trial court properly denied Denver Options' motion for directed verdict on this issue.

### B. Bethphage's Contract

Bethphage argues that it had an absolute right to remove J.C. and R.M. from Omedelena's care. Again, we disagree.

Here, the contract between Bethphage and Omedelena provided:

> If at any time Bethphage or the Client's Interdisciplinary Team reasonably believes that the welfare and well-being of the Client has been seriously compromised, the Client may be removed from Provider's care and home immediately and without notice to Provider and this contract shall be terminated with any compensation due Provider for the month in which such termination occurs prorated to the date of removal.

■ Contrary to Bethphage's contention, this language did not authorize Bethphage to remove J.C. and R.M. from Omedelena's care without qualification. Indeed, the contract specifically provided that Bethphage could only remove J.C. and R.M. if it reasonably believed that their welfare was seriously compromised. This language creates, at a minimum, an issue of fact regarding whether Bethphage reasonably believed that J.C. and R.M. were in danger after the June 9 incident and the vacation.

Thus, we conclude that because Bethphage did not have an absolute contractual right to remove J.C. and R.M., the issue regarding whether Bethphage acted improperly was properly submitted to the jury.

### III. Privilege to Interfere

Denver Options and Bethphage nevertheless argue that they were privileged, as a matter of law, to interfere with Omedelena's contract with ITDS because they were acting to protect the welfare of J.C. and R.M. We are not persuaded.

■ The Restatement (Second) of Torts recognizes that under certain circumstances, interference with contract relations or prospective economic advantage is privileged and is therefore not improper as a matter of law. *See Amoco Oil Co. v. Ervin, supra* (adopting competitor privilege articulated in Restatement (Second) of Torts § 768).

■ The privilege to act for the welfare of a third person provides as follows:

> One who, charged with responsibility for the welfare of a third person, intentionally causes that person not to perform a contract or enter into a prospective contractual relation with another, does not interfere improperly with the other's relation if the actor
> (a) does not employ wrongful means and
> (b) acts to protect the welfare of the third person.

Restatement (Second) of Torts § 770 (1979).

Here, the trial court provided the jury with an instruction that paralleled this provision. In addition, the trial court provided the following instruction defining wrongful means:

> [Any act that is] independently wrongful, such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade, or any other wrongful act recognized by statute or common law; [or if the defendant] was not acting in good faith for the interests of the client; or [if the defendant] was motivated by self-interest.

Denver Options and Bethphage argue that because they are mandated by statute and regulation to protect J.C. and R.M., it is impossible, as a matter of law, for them to have employed any wrongful means.

■ However, as discussed above, Denver Options and Bethphage did not have an absolute statutory or contractual right to interfere with Omedelena's contract. Further,

evidence was submitted at trial that: (1) Bethphage was frequently lobbying Denver Options to change its procedures so that it would be more difficult for a host home provider to switch service agencies; (2) Bethphage was very concerned about its financial stability and became hostile towards Omedelena when she announced her resignation and intent to contract with a rival service agency; (3) Bethphage and Denver Options had not in the past removed developmentally disabled persons from a host home provider where there were more serious allegations of neglect; and (4) Omedelena had indeed taken J.C. and R.M. on vacation, with prior notification to Bethphage. Thus, an issue of fact remained regarding whether Bethphage and Denver Options had employed a wrongful means, as defined in the jury instructions. Therefore, this issue was properly before the jury, and the trial court did not err when it denied defendants' motion for directed verdict on this basis. *See Evans v. Webster, supra.*

## IV. Denver Options' Funding Decisions

Bethphage contends it could not have interfered with Omedelena's contractual relations or prospective economic advantage because the contract funding was controlled solely by Denver Options. Again, we disagree.

Here, the trial court instructed the jury that the interference was defined as "[a]ny intentional conduct of a person that renders another person's performance of his or her contractual obligations impossible or more burdensome." Bethphage did not object to this jury instruction.

■ Sufficient evidence was presented at trial to enable the jurors to conclude that Bethphage's hostility towards Omedelena influenced Denver Options' decision to withdraw funding. In addition, the jury instruction did not limit interference to only funding decisions that directly caused ITDS to rescind the contract with Omedelena. Thus, there was ample evidence that Bethphage's conduct made Omedelena's contract with ITDS impossible or more burdensome to perform. Therefore, the trial court properly denied Bethphage's motion for a directed verdict on this issue. *See Evans v. Webster, supra.*

## V. Issues Preserved on Appeal

Omedelena argues that Denver Options and Bethphage have not properly preserved seven issues that they raise on appeal. *See Estate of Stevenson v. Hollywood Bar & Cafe, Inc.,* 832 P.2d 718 (Colo.1992)(arguments never presented to, considered, or ruled upon by a trial court may not be raised for the first time on appeal). We agree in part and address her contentions below.

■ Initially, Omedelena asserts that Denver Options and Bethphage did not raise their absolute statutory right, contractual right, and privilege contentions before the trial court. The record reflects that Denver Options sufficiently preserved these arguments in its oral motion for a directed verdict, which incorporated its motion for summary judgment where these issues were raised. Denver Options also submitted a jury instruction on the issue of absolute right which was rejected by the trial court. In addition, Bethphage sufficiently raised these issues when it joined Denver Options' motion for directed verdict.

We also reject Omedelena' contention that because the contract between Denver Options and ITDS was not introduced at trial, we cannot review any of Denver Options' issues related to it. The contract was included in Denver Options' motion for summary judgment and is part of the record.

■ However, we agree with Omedelena that Denver Options did not properly preserve the following three issues for appeal: (1) that it cannot be held liable for intentional interference with contract relations and prospective economic advantage for the mere refusal to deal with ITDS; (2) that the claim of intentional interference with economic advantage required Omedelena to prove, as part of her prima facie case, that defendants interfered with her contract with ITDS by using wrongful means; and (3) that Omedelena failed to present any evidence concerning Denver Options' wrongful means. Therefore, we do not address these issues.

Finally, although Omedelena does not raise this issue, to the extent that Denver Options argues that the wrongful means definition provided to the jury was not proper, we decline to review this contention because it is raised for the first time on appeal.

The judgment is affirmed.

Judge MARQUEZ and Judge VOGT concur.