REED MILL & LUMBER CO., INC., Plaintiff–Appellant and Cross–Appellee,

v.

Neil JENSEN, Defendant–Appellee and Cross–Appellant,

and

General Building Materials, Inc., Defendant–Appellee.

No. 05CA0431.

Colorado Court of Appeals, Div. IV.

Sept. 21, 2006.

As Modified on Denial of Rehearing Feb. 15, 2007.*

Certiorari Denied July 30, 2007.

* Casebolt, J., would GRANT.

Jester & Gibson, Jay S. Jester, Nancy Bauer Egelhoff, Denver, Colorado, for Plaintiff–Appellant and Cross–Appellee.

Bucholtz & Bull, P.C., James C. Bull, Greenwood Village, Colorado, for Defendant–Appellee and Cross–Appellant.

Holland & Hart, LLP, Mark B. Wiletsky, Boulder, Colorado, for Defendant–Appellee.

Opinion by Judge CARPARELLI.

Plaintiff, Reed Mill & Lumber Co., Inc., appeals the judgment in favor of defendants, Neil Jensen and General Building Materials, Inc. Jensen cross-appeals the failure to award him attorney fees. We affirm.

## I. Background

Jensen worked for Reed Mill, a mill and lumber business, from 1973 until 2002. During his employment, and before the company was sold in 1996, Jensen received a bonus in the form of company stock.

In 1996, Reed Mill sold its name and all or nearly all of its operating assets to Vranian Enterprises, Inc. (buyer). During the parties' negotiations, it was agreed that each of Reed Mill's shareholders would be required to sign a noncompete agreement.

Section 10 of the purchase agreement states that Reed Mill's covenant not to compete was necessary to ensure the continuation of the business with regard to the assets being sold. It states further that, as consideration and necessary inducement for the purchase, Reed Mill agreed that for a period of three years from the closing date, it would not, among other things, own, manage, operate, or participate in the management or control of any enterprise within a 100-mile radius that was engaged in the provision of mill and lumber services and products.

Reed Mill distributed the proceeds of the sale to its shareholders in accordance with the percentage of shares held by each. Jensen received $50,000 for his shares of the company stock. Shortly after the transaction closed, Jensen and the other shareholders signed noncompete agreements. Of the total price the buyer paid to Reed Mill, $115,000 was allocated as compensation for goodwill and the covenant not to compete. Of this amount, Reed Mill paid Jensen a pro rata share in the amount of $9,857.

Jensen's noncompete agreement states that it was made pursuant to the asset purchase agreement. It provides that the three-year prohibition against competition would begin upon termination of Jensen's employment for any reason, and continue for three years thereafter. The agreement also contains a provision entitling the prevailing party to attorney fees and costs in the event of litigation.

For the first few years after the sale, buyer operated the business under the Reed Mill name, and Jensen continued to manage and oversee the new Reed Mill's operations as its general manager, and remained responsible for operations and sales. Thereafter, although he continued to be responsible for sales, his operational responsibilities were assigned to other employees.

Jensen resigned in 2002 and began working for General Building Materials, Inc. (GBM). Reed Mill sued Jensen for breach of the noncompete agreement and sued GBM for tortious interference with contract. After the jury reached a verdict in favor of Reed Mill, Jensen and GBM filed motions for a directed verdict and for judgment not withstanding verdict, contending that the noncompete agreement was invalid.

The trial court concluded that because the parties executed the noncompete in connection with the sale and purchase of a business, the noncompete was permitted under an exception to Colorado's statutory bar on covenants not to compete. It also found that, at the time of his departure, Jensen was not an executive or management employee of the company, and therefore the executive and management personnel exception did not apply.

The court noted that buyer's principal admitted that the three-year noncompete agreement signed by Reed Mill's majority shareholder, who owned nearly ten times more shares than Jensen, was reasonable to protect buyer's purchase of Reed Mill's good will. On that basis, the court concluded that three years was more than sufficient for buyer to establish itself in the industry.

On these premises, the court found no valid reason why Jensen, a mere employee and an owner of only a small percentage of the business, should be prohibited from competing with Reed Mill in 2002, six years after the closing date. The court also found that prohibiting Jensen from employment in the only area in which he had experience would place an undue hardship on him, and that it was not necessary to bar Jensen for six years after the date of sale, much less for nine years after the sale.

Accordingly, the court ordered a directed verdict and entered judgment for defendants, finding that the duration of the noncompete agreement was unreasonable. The court or-

dered each party to pay its own attorney fees.

Reed Mill appeals the directed verdict, and Jensen cross-appeals the rulings that the parties must pay their own attorney fees and that the noncompete was made in connection with the sale of a business.

## II. Reasonableness in Connection with Sale

Reed Mill contends that although the trial court correctly concluded that Jensen's noncompete agreement was made in connection with the purchase agreement, it erred when it concluded that the duration of the agreement was unreasonable. We perceive no error.

### A. Covenants Not to Compete

■ Colorado public policy disfavors covenants not to compete. However, § 8–2–113, C.R.S.2006, permits such covenants in limited circumstances. *DBA Enters., Inc. v. Findlay,* 923 P.2d 298, 302 (Colo.App.1996). When a covenant not to compete is statutorily permitted, it is enforceable only if it is reasonable in duration and geographic scope. *Nat'l Graphics Co. v. Dilley,* 681 P.2d 546 (Colo.App.1984); *Colo. Accounting Machs., Inc. v. Mergenthaler,* 44 Colo.App. 155, 609 P.2d 1125 (1980). To be reasonable, a noncompete agreement must not be broader than necessary to protect the promisee's legitimate interests, and it must not impose hardship on the promisor. *See Whittenberg v. Williams,* 110 Colo. 418, 135 P.2d 228 (1943). Covenants not to compete "for terms up to five years and within distances of 100 miles" are commonly upheld. *Harrison v. Albright,* 40 Colo.App. 227, 231, 577 P.2d 302, 305 (1977).

### 1. Covenants Ancillary to the Purchase of a Business

■ Section 8–2–113(2)(a), C.R.S.2006, permits covenants not to compete in connection with contracts for the purchase and sale of a business or the assets of a business. When ancillary to the sale of a business, such covenants protect the buyer's right to enjoy the business good will for which it paid. *Gibson v. Eberle,* 762 P.2d 777, 779 (Colo.

App.1988). Good will "is an incident of a continuing business having a particular locality or name," and includes "the expectation of continued and repeated public patronage." *Nat'l Propane Corp. v. Miller,* 18 P.3d 782, 786 (Colo.App.2000).

■ Where the evidence provides adequate support, we will not overturn the trial court's finding that a noncompete agreement was made in connection with a sale of business under § 8–2–113(2)(a). *Boulder Med. Ctr. v. Moore,* 651 P.2d 464, 465 (Colo.App. 1982).

### 2. Reasonableness and Enforceability

■ The reasonableness of covenants ancillary to the sale of business depends on whether the restraint on competition provides fair protection to the buyer's purchase of good will, while imposing restrictions no greater than necessary to protect the value of that good will. *See Barrows v. McMurtry Mfg. Co.,* 54 Colo. 432, 131 P. 430 (1913) (an agreement that arbitrarily binds the seller beyond the duration and geographical scope necessary to protect the good will transferred is without consideration); *Gibson v. Eberle, supra,* 762 P.2d at 779.

■ Reasonableness turns on the facts of each case. *Zeff, Farrington, & Assocs., Inc. v. Farrington,* 168 Colo. 48, 50, 449 P.2d 813, 814 (1969). "To the extent that the legal determinations turn on questions of fact—for example whether a restrictive covenant was reasonable in scope—the [appellate] court must accept the district court's findings unless those findings are clearly erroneous." *Bus. Records Corp. v. Lueth,* 981 F.2d 957, 959 (7th Cir.1992) (citation omitted).

■ Some courts have held that, depending on the circumstances, a covenant not to compete that is ancillary to the sale of a business may be enforceable even when a covenant of similar breadth incident to employment would not be. *See Rent–A–Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.,* 944 F.2d 597, 600 (9th Cir.1991); *Gann v. Morris,* 122 Ariz. 517, 518, 596 P.2d 43, 44 (Ct.App.1979); *H & R Block, Inc. v. Lovelace,* 208 Kan. 538, 544, 493 P.2d 205,

210 (1972). Nonetheless, when the duration of a covenant not to compete is greater than is necessary to protect legitimate interests, it is unreasonable and, consequently, unenforceable. *See Alexander & Alexander, Inc. v. Danahy,* 21 Mass.App.Ct. 488, 488 N.E.2d 22, 29 (1986).

### B.  Unenforceable Agreement

■ Reed Mill asserts that it was reasonable to begin the three-year noncompetition period upon termination of Jensen's employment because Jensen possessed good will at the time of the sale and maintained that good will during his employment with the new company. We disagree.

The purchase agreement states that the covenant not to compete was necessary to ensure the continuation of the business. And, indeed, buyer purchased the good will that was incident to old Reed Mill's locality, name, and expectation of continued and repeated patronage by its customers.  It purchased the company's good will from its owners.  Because Jensen was an owner, Jensen received a pro rata share of the amount buyer paid for that good will.

Buyer was entitled to protect its enjoyment of that good will and establish itself in the industry without competition from the former company or its owners.  Such protection was afforded by a period of noncompetition that prevented the former owners from benefiting from the company's good will, gave buyer time to convert that good will to its own, and dissipated the extent to which the marketplace identified the company with the former owners.

For the first three years after the sale, buyer enjoyed the absence of competition from any former owner, including Jensen. In addition, Jensen did not benefit personally from old Reed Mill's good will.  Instead, as one employee of new Reed Mill's employees, he participated in buyer's efforts to convert that good will to its own, preserve the patronage of past customers, and establish itself in the locale and industry.  Thus, during this time, buyer's right to the good will was protected.

For purposes of our analysis here, it does not matter whether the absence of competition from Jensen during this period resulted from his compliance with the noncompete agreement or buyer's decision to hire Jensen and, thereby, also obtain his loyalty.  Nor does it matter that by hiring Jensen, buyer made the noncompete agreement unnecessary for the duration of the employment relationship.  What matters is whether enforcement of the covenant after those three years was necessary to provide fair protection to buyer's legitimate interests in converting old Reed Mill's good will to its own.

In this regard, we recognize the possibility that the identification of Jensen with old Reed Mill did not dissipate to the same extent as it did with regard to shareholders whom buyer did not employ.  Hence, it is conceivable that, although new Reed Mill had had three years to convert the company's good will to its own, and was in a better position in that regard than it had been immediately after the sale, Jensen may have posed a greater risk to Reed Mill's ability to continue to enjoy that good will than did the former shareholders who had remained completely out of the marketplace.

But Reed Mill continued to employ Jensen for another three years after the noncompetition obligations of the other former shareholders expired.  Thus, the question as presented to the trial court was not whether the agreement was enforceable at its inception, but rather, whether beginning six years after buyer purchased old Reed Mill's good will, enforcement of yet another three years of freedom from Jensen's competition was reasonable as a means of protecting the value of buyer's purchase.

Consistent with the appropriate reasonableness analysis, the trial court considered Jensen's percentage of ownership, the nature of Jensen's employment at Reed Mill after the purchase, Jensen's professional experience, and the terms of the other shareholders' noncompete agreements.  The court found that (1) the evidence established that three years was a sufficient time for buyer to take over the business, learn the trade, and be free of competition from the former owners of Reed Mill;  (2) three years was a

reasonable period of time and more than sufficient for buyer to establish itself in the industry; (3) there was no valid reason why Jensen should have a noncompete agreement that extended six years; (4) at the time of his termination from new Reed Mill, Jensen was not in a position of management or in an executive position; and (5) under the circumstances, it would pose an undue hardship on Jensen to require that he not participate in employment in the only area in which he had experience. Each of these findings is supported in the record and is supportive of the court's finding that the agreement to commence the period of noncompetition beginning six years after the purchase was not reasonable.

In addition, it is undisputed that at the time of the court's ruling, buyer had had a period of six years after the purchase to ensure continuation of the business and to protect the value of the good will it had purchased. Had the trial court allowed Reed Mill to enforce the agreement, Reed Mill would have expanded that period to nine years. And the record supports the court's findings that doing so would have restricted Jensen's right to work and to receive compensation for his work more than was necessary to protect the value of buyer's purchase of good will and, thus, that the hardship on Jensen would have been undue.

Therefore, we conclude that the trial court did not err when it found that the agreement was not reasonable and, accordingly, concluded that it was no longer enforceable.

### III. Connection with Employment

We now turn to Reed Mill's contention that the trial court erred when it found that the noncompete agreement was not also made in connection with Jensen's employment as an executive or manager. Again, we perceive no error.

### A. Executive–Management Exception

Section 8–2–113(2)(d), C.R.S.2006, permits covenants not to compete for "[e]xecutive and management personnel and officers."

■ The executive-management exception applies to employees who are "in charge" and act in an unsupervised capacity. *Atmel Corp. v. Vitesse Semiconductor Corp.,* 30 P.3d 789, 794 (Colo.App.2001). Courts have focused more on an employee's degree of skill, knowledge, or autonomy, rather than on his or her relationships with customers. *See Porter Indus. Inc. v. Higgins,* 680 P.2d 1339 (Colo.App.1984) (employee's lack of supervisory capacity was dispositive, despite employee's client contacts); *Harrison v. Albright, supra,* 40 Colo.App. at 231, 577 P.2d at 304 (employee's knowledge, skills, and licenses made him the "key man and very heart of the business").

■ Whether an employee is executive or management personnel is a question of fact for the trial court. *Mgmt. Recruiters, Inc. v. Miller,* 762 P.2d 763 (Colo.App.1988). Findings of fact made by the trial court are binding on review if supported by evidence in the record. *Gold Messenger, Inc. v. McGuay,* 937 P.2d 907, 911 (Colo.App.1997).

### B. Jensen's Employment

■ Reed Mill does not dispute that Jensen did not have executive or management responsibilities at the time of his termination. Instead, it argues that Jensen was the general manager of old Reed Mill when he executed the noncompete agreement and, therefore, that the agreement was made in connection with his employment before the purchase.

Thus, Reed Mill asserts that the trial court erred when it considered Jensen's responsibilities at the time of termination. It argues that the trial court's finding did not give effect to the parties' intentions at the execution of the noncompete agreement, which included protection of the good will Jensen continued to command as a key employee or managerial personnel. We are not persuaded.

The noncompete agreement explicitly states that it was made "pursuant to" the asset purchase agreement. It states further that the parties recognized that Jensen had served as an officer and key employee of Reed Mill and had contributed significantly to the company's success. There is no indication that Jensen's noncompete agreement was not the one referred to in the purchase

agreement. It does not state buyer directly compensated Jensen for entering into the agreement. Instead, the evidence indicates that a portion of the amount buyer paid old Reed Mill was allocated to goodwill and noncompetition, and that old Reed Mill distributed the proceeds of the sale to its shareholders. In addition, the noncompete agreement was not a condition of buyer's offer of employment to Jensen in an executive or managerial capacity, or otherwise premised on the duties and responsibilities Jensen would have in the future.

Reed Mill's rationale for beginning the term of Jensen's noncompete when his employment ended was "to provide Reed Mill time to convert [Jensen's] goodwill into its own." However, buyer paid an agreed amount based on old Reed Mill's good will, not based on the relative good will of each shareholder, even assuming such could be the case. Indeed, there are no Colorado cases that have recognized an employer's right to protect good will created by an employee's relationships with the employer's customers. *Cf. Prow v. Medtronic, Inc.,* 770 F.2d 117, 120 (8th Cir.1985).

The purchase agreement explicitly stated that the purpose of the noncompete agreements was to ensure the continuation of the business with regard to the assets being purchased. Thus, the evidence supports the conclusion that the agreement was to protect buyer's purchase of good will, and not to protect high-level business strategies or knowledge to which an executive or managerial employee would likely have access.

Accordingly, we conclude that the court's finding that Jensen's noncompete agreement was in connection with the sale of the business and not with Jensen's employment as a general manager of old Reed Mill was not clearly erroneous.

Because we conclude that the trial court did not err when it ruled that the noncompete agreement was unreasonable in connection with the purchase of the business, and also conclude that the agreement was not in connection with Jensen's employment, we need not address GBM's contention that, because Jensen was a minority shareholder, we should rule that the agreement must be ana-lyzed under standards applicable to employment contracts and not under those applicable to the purchase of a business.

## IV. Moot Cross–Appeal

Jensen contends that the trial court correctly concluded that the executive and managerial personnel provision of § 8–2–113(2)(d) does not apply. However, he contends that the agreement was not connected to the asset purchase agreement, and, therefore, the trial court erred when it concluded that a noncompete agreement was permissible under § 8–113(2)(a). Having concluded that the trial court did not err when it found that the noncompete agreement was unreasonable and rendered judgment in Jensen's favor, we conclude that this question is moot.

## V. Attorney Fees

■ Jensen also contends that the trial court erred by not awarding him attorney fees as the prevailing party pursuant to the fee-shifting provision included in the noncompete agreement. We disagree.

In his counterclaims, Jensen alleged, among other things, that the noncompete agreement (1) was void ab initio, in part because it violated § 8–2–113(2)(a); (2) violated the Colorado Antitrust Act of 1992, § 6–4–101, et seq., C.R.S. 2006, and that, as a consequence of the violation, he was entitled to attorney fees under § 6–4–114(2), C.R.S. 2006; and (3) was a wrongful interference with his future business expectations. In his prayer for relief he asked for the relief "prayed for in his [c]ounterclaims, including costs, reasonable attorneys fees[,] and such other relief to which he may be entitled." Jensen's answer and counterclaims contained no reference to the agreement's fee-shifting provision.

In the trial management order, Jensen claimed the agreement should be rescinded due to Vranian's fraud. Jensen's motion for directed verdict and judgment notwithstanding the verdict sought a declaration that the agreement was void, and that he had been wrongfully discharged. He asked for attorney fees only in relation to the tort of wrongful discharge, and, again, made no reference

to the agreement's fee-shifting provision. The trial management order also stated that Jensen would raise his prayer for attorney fees in post-trial motions practice.

However, Jensen's motion did not include a request that he be awarded attorney fees based on the fee-shifting provision in the agreement. In the order granting Jensen's motion, the court ordered that each side would pay its own attorney fees. And Jensen did not file a motion for post-trial relief under C.R.C.P. 59 or for relief from the judgment under C.R.C.P. 60 as to that order. After the court entered judgment in his favor, he filed a bill of costs under § 13–16–105, C.R.S. 2006, and C.R.C.P. 54(d). However, he did not file a motion for attorney fees as required by C.R.C.P. 121 § 1–22.2(a).

Thus, although Jensen asserted during oral argument on appeal that he asked the trial court for attorney fees under the terms of the agreement, the record contains no such request.

He now asserts that the trial court erred when it did not award him his legal fees under the agreement's fee-shifting provision. But because Jensen did not pursue an award of attorney fees in the trial court in the manner required by C.R.C.P. 121 § 1–22.2, we decline to address this contention.

Further, Jensen's answer brief and opening brief on cross-appeal did not ask for an award of the attorney fees he incurred in the appeal. In his reply brief, he argued for the first time that he should be awarded fees he incurred not only at trial, but also in his appeal. However, C.A.R. 39.5 requires a party claiming attorney fees incurred in the appeal to specifically request them, and to state the basis for the request, in the party's principal brief in the appellate court.

In support of his request he cites only C.R.C.P. 121; *Voller v. Gertz*, 107 P.3d 1129 (Colo.App. 2004) (pertaining to wage claims under § 8–4–101, et seq., C.R.S. 2006); and *Chartier v. Weinland Homes, Inc.*, 25 P.3d 1279 (Colo.App. 2001) (addressing whether the amount of attorney fees may be determined by the jury or the court, whether the plaintiff's claim for attorney fees should be disallowed because of untimely and insuffi-

cient disclosures, and whether fees incurred after an offer of settlement and awarded as costs should be considered when comparing the offeree's recovery with the settlement offer). These authorities are not relevant to his request for fees on appeal. And except for his citation to these cases, Jensen did not state a basis for his request.

Thus, because Jensen did not comply with C.A.R. 39.5 and provides no legal authority or relevant case law regarding his asserted right to appellate attorney fees under the agreement, we also decline to address this request for appellate fees.

Judgment affirmed.

Judge CASEBOLT concurs.

Judge J. JONES specially concurs.

Judge J. JONES specially concurring.

I concur in Parts I, III, IV, and V of the majority opinion. I respectfully disagree, however, with the analysis of the question of the enforceability of Jensen's covenant not to compete in Part II of the majority opinion. In my view, it is not the latency period which renders the covenant unreasonable (I believe that aspect of the covenant is reasonable), but rather the length of the period during which competition is prohibited (three years) and the size of the geographic area in which competition is prohibited during that three-year period (within 100 miles of Reed Mill's place of business in Denver). Thus, because I conclude, for reasons different from those on which the majority relies, that the covenant is unreasonable, I concur in the judgment.

## I. Standard of Review

The parties stipulated during trial that the issue of the enforceability of the covenant not to compete would be determined by the court "as a matter of law" in the event the jury found that Jensen had breached the covenant. Thus, that issue was decided in the context of a motion for a directed verdict under C.R.C.P. 50. In ruling on that motion, the trial court found that the facts relevant to the issue of enforceability were "undisputed."

Where the trial court decides an issue based on undisputed facts in the context of a C.R.C.P. 50 motion for a directed verdict, our review of that issue is de novo. *Omedelena v. Denver Options, Inc.*, 60 P.3d 717, 722 (Colo.App.2002); *Evans v. Webster*, 832 P.2d 951, 954 (Colo.App.1991). Further, the ultimate question of whether a covenant not to compete is enforceable is one of law, which we review de novo. *See Central Bank of the South v. Beasley*, 439 So.2d 70, 73 (Ala.1983) (enforceability of covenant not to compete reviewed de novo where material facts are undisputed); *Gann v. Morris*, 122 Ariz. 517, 596 P.2d 43, 44 (Ct.App.1979) (reasonableness of covenant not to compete is a question of law); *Raymundo v. Hammond Clinic Ass'n*, 449 N.E.2d 276, 280 (Ind.1983) (same); *Bowen v. Carlsbad Ins. & Real Estate, Inc.*, 104 N.M. 514, 724 P.2d 223, 225 (1986) (same).

While we should accept a trial court's findings of historical fact if supported by the record, *see Chapman v. Willey*, 134 P.3d 568, 569 (Colo.App.2006), the trial court made no such findings in this case, only conclusions of law based on undisputed facts. Therefore, we owe no deference to the court's rulings on the issues before us. *Weed v. Monfort Feed Lots, Inc.*, 156 Colo. 577, 580, 402 P.2d 177, 179 (1965); *Vu, Inc. v. Pacific Ocean Marketplace, Inc.*, 36 P.3d 165, 167 (Colo.App. 2001); *Evans, supra*, 832 P.2d at 954.

## II. Discussion

I agree with the majority's conclusions that (1) Jensen's covenant not to compete was agreed to in conjunction with the sale of Reed Mill, and is therefore permitted by the plain language of § 8–2–113(2)(a), C.R.S. 2006; and (2) the covenant not to compete was not part of an employment agreement, and is therefore not permitted by the statutory exception in § 8–2–113(2)(d), C.R.S. 2006, pertaining to executive and management personnel. Thus, in this case, as the majority correctly observes, the enforceability of the covenant turns on whether the covenant is "reasonable." In the context of a covenant ancillary to the sale of a business, "[t]he test to determine the reasonableness of such [a covenant] is whether the restraint provides a fair protection to the interests of the purchasing party in reasonably protecting that which [it] bought." *Gibson v. Eberle*, 762 P.2d 777, 779 (Colo.App.1988) (citing *Barrows v. McMurtry Mfg. Co.*, 54 Colo. 432, 438–40, 131 P. 430, 432–33 (1913)). Moreover, the hardship imposed on the covenantor must not be "undue." *Whittenberg v. Williams*, 110 Colo. 418, 420, 135 P.2d 228, 229 (1943).

The majority concludes that, in hindsight, the covenant here is unreasonable because it was not triggered until six years had passed from the date of the sale. In effect, therefore, the majority finds the covenant unreasonable because it contained an indefinite latency period—that is, because it could be triggered no matter how long Jensen continued to work for the company after the sale. I disagree with that approach.

"The purpose of enforcing covenants ancillary to the sale of a business is to make the good will of the business conveyed 'a saleable asset by protecting the buyer in the enjoyment of that for which he pays.' " *Gibson, supra*, 762 P.2d at 779 (quoting 6A A. Corbin, *Contracts* § 1387 (1962)). Where a seller in whom some measure of the purchased business's good will is reposed continues to work for the purchased business after the sale, a buyer is not fully protected in the enjoyment of that for which he pays—the good will—merely by virtue of the sale. This is because that good will may, to some extent, remain reposed in the seller-employee while he continues to work for the company. Indeed, a buyer may purchase a business in the hope that the seller will continue to use that good will for the benefit of the company following the sale.

As one court has put it,

[i]t is not at all unusual for the seller of a business to join the new enterprise in an employment capacity. There are obvious advantages to both sides which flow from such an arrangement. *It enables the purchaser to carry on the old business with the least possible dislocation and loss of good will.* Established customers in the business sold could be expected to patronize the successor business. And such an arrangement provides the seller with the

opportunity to be productive in the work with which he is familiar, and to gain income.

Alexander & Alexander, Inc. v. Danahy, 21 Mass.App.Ct. 488, 488 N.E.2d 22, 28 (1986) (emphasis added).

In this case, therefore, as a matter of economic reality, some portion of Reed Mill's good will that Jensen possessed presumably remained reposed in him *after* the sale, notwithstanding that the buyer "owned" it. *See Alexander & Alexander, supra,* 488 N.E.2d at 29. Given this economic reality, the focus of the reasonableness inquiry should be on whether the covenant is no broader than necessary to protect the buyer's interest in retaining that good will in the event Jensen's association with the company were to cease.

By virtue of the latency period in Jensen's covenant not to compete, the buyer purchased protection for its interest in the good will in the form of a period of time in which, following Jensen's disassociation from the company, Reed Mill could attempt to capture independently, and entirely for itself, whatever good will was reposed in Jensen, without any interference from Jensen. Such latency periods may be essential to adequately protect the purchaser's interest in good will. So long as the seller is employed by the company, a covenant not to compete is unnecessary to protect that interest because the employee's common law duty of loyalty precludes any competition with the employer. *Jet Courier Serv., Inc. v. Mulei,* 771 P.2d 486, 492–93 (Colo.1989). For the buyer, therefore, the critical concern is how to protect the good will it purchased after the seller-employee in whom good will may be reposed is no longer employed by the company. A covenant not to compete which is triggered upon the employee's disassociation from the company addresses that concern. *See Central Bank, supra,* 439 So.2d at 73–74.

· Our supreme court has enforced covenants not to compete containing latency periods in employment contracts. *See, e.g., Zeff, Farrington & Assocs., Inc. v. Farrington,* 168 Colo. 48, 449 P.2d 813 (1969); *Whittenberg, supra; Freudenthal v. Espey,* 45 Colo. 488, 102 P. 280 (1909). Latency periods are common features of such covenants, and I am not aware of any case invalidating such a covenant on the basis it included a latency period.

Though the majority asserts that "there are no Colorado cases that have recognized an employer's right to protect good will created by an employee's relationships with the employee's customers," protection of good will created through such relationships is frequently the implicit rationale for enforcing covenants not to compete ancillary to employment in many cases. Such covenants, which by their nature typically include latency periods, may be necessary to fully protect an employer's interest in good will generated through such relationships, regardless of when that good will was acquired. *See, e.g., Harrison v. Albright,* 40 Colo.App. 227, 577 P.2d 302 (1977) (affirming grant of injunctive relief enforcing covenant not to compete triggered by exit from the company where evidence that defendant had taken several of the company's customers showed irreparable injury). *See generally* Harlan M. Blake, *Employee Agreements Not to Compete,* 73 Harv. L.Rev. 625, 653–67 (1960) (customer relationships, including those created and nurtured by covenantor-employee, constitute one historical justification for enforcing covenants not to compete ancillary to employment); Restatement (Second) of Contracts § 188 cmt. g (preventing employee from attracting customers away from employer one rationale for enforcing such covenants).

Courts in other jurisdictions have enforced covenants not to compete which include latency periods where such agreements are ancillary to sales of businesses. *See, e.g., Business Records Corp. v. Lueth,* 981 F.2d 957, 959–62 (7th Cir.1992) (covenant in effect from the later of three years after the sale or two years after termination of employment; employee left company six years after the sale); *Central Bank, supra,* 439 So.2d at 71–74 (covenant in effect from the later of two years after the sale or two years after termination of employment); *Alexander & Alexander, supra,* 488 N.E.2d at 25, 28–29 (covenant effective for five years after date of termination of employment); *cf. Harrison, supra,* 40 Colo.App. at 229, 231–32, 577 P.2d at 303–05 (enforcing five-year covenant with indefinite latency period which was "analo-

gous to one ancillary to a 'contract for the purchase and sale of a business' " (quoting § 8–2–113(2)(a))). *But see Laidlaw, Inc. v. Student Transp., Inc.,* 20 F.Supp.2d 727, 734, 754–57 (D.N.J.1998) (refusing to enforce covenant running from five years after date of sale or five years after termination of employment, whichever is later, on grounds buyer "no longer" had a protectable interest nine years after the sale). Again, the courts have recognized the value of a latency period in protecting a buyer's interest in good will.

Therefore, if the reasonableness of Jensen's covenant turned solely on the existence of the latency period, I would have no difficulty in concluding that the covenant is reasonable, notwithstanding that Jensen worked for the purchased company for six years after the sale. But the inquiry is not limited to the latency period. We also must consider the reasonableness of the period of noncompetition and the scope of the geographic restriction.

I am mindful that in reviewing the reasonableness of covenants not to compete which are ancillary to sales of businesses, we ordinarily view them less critically than similarly broad covenants agreed to in other contexts. *See National Propane Corp. v. Miller,* 18 P.3d 782, 787 (Colo.App.2000) (citing *Centorr–Vacuum Indus., Inc. v. Lavoie,* 135 N.H. 651, 609 A.2d 1213, 1215 (1992)). While there are sound policy reasons for this rule, those reasons require examination in this case.

Courts are more likely to enforce covenants not to compete which are ancillary to the sale of a business because

> there is more likely to be equal bargaining power between the parties; the proceeds of the sale generally enable the seller to support himself temporarily without the immediate practical need to enter into competition with his former business; and a seller is usually paid a premium for agreeing not to compete with the buyer.

*Alexander & Alexander, supra,* 488 N.E.2d at 28; *accord Rent–A–Center, Inc. v. Canyon Television & Appliance Rental, Inc.,* 944 F.2d 597, 601 (9th Cir.1991) (applying Kansas law); *Fogle v. Shah,* 539 N.E.2d 500, 502 (Ind.Ct.App.1989); *Centorr–Vacuum Indus.,*

*supra,* 609 A.2d at 1215; *Weaver v. Ritchie,* 197 W.Va. 690, 478 S.E.2d 363, 367–68 (1996).

There is no indication in the record that Jensen and the buyer had relatively equal bargaining power. Typically, it is the majority shareholder (often the sole shareholder) who executes a covenant not to compete upon the sale of his interest in the business. *See, e.g., Weber v. Nonpareil Baking Co.,* 85 Colo. 232, 274 P. 932 (1929); *Barrows, supra; DBA Enterprises, Inc. v. Findlay,* 923 P.2d 298 (Colo.App.1996); *cf. Gibson, supra* (one partner sold his interest in the business to the other). Jensen, however, owned only 8.6% of Reed Mill's stock at the time of the sale. He was not involved in the negotiations pertaining to the sale, and he had no practical or legal ability to negotiate terms, much less prevent the sale. This is not to say that a covenant not to compete ancillary to the sale of a business is necessarily unenforceable as to a minority shareholder. Rather, relative bargaining power under the particular facts of the case is one factor to consider.

Further, the sum Jensen received for his covenant not to compete, $9,857, is nowhere near sufficient to allow him to temporarily support himself without the practical need to engage in the only type of business in which he has worked. *See Bowen, supra,* 724 P.2d at 225 (amount paid for covenant is a relevant factor in determining its enforceability). By comparison, the majority shareholder (who did not continue to work for Reed Mill) received over $100,000 in return for his covenant not to compete. Yet, Jensen's covenant is every bit as restrictive as the majority shareholder's with respect to the time period and geographic scope.

Nor does it appear that Jensen, as a minority shareholder, received a premium for his share of the company's good will. Rather, he was paid for his good will in strict pro rata proportion to the amount of stock he held in old Reed Mill: whether such pro rata payment actually corresponds to that portion of the good will reposed in Jensen is not disclosed by the record.

Thus, in these circumstances, we should not examine Jensen's covenant any less critically than if he had entered into it in connec-

tion with a contract of employment. *See Roto–Die Co., Inc. v. Lesser,* 899 F.Supp. 1515, 1519 (W.D.Va.1995) (applying Virginia law); *White v. Fletcher/Mayo/Assocs., Inc.,* 251 Ga. 203, 303 S.E.2d 746, 749–50 (1983); *Coskey's Tel. & Radio Sales & Serv., Inc. v. Foti,* 253 N.J.Super. 626, 602 A.2d 789, 793–94 (App.Div.1992); *Alexander & Alexander Servs., Inc. v. Maloff,* 105 A.D.2d 1066, 482 N.Y.S.2d 386, 387–88 (1984). Regardless of which level of scrutiny is appropriate, however, I cannot conclude that the covenant is reasonable.

As noted above, it is well-established that a covenant not to compete is unreasonable if it works an undue hardship on the covenantor. *Knoebel Mercantile Co. v. Siders,* 165 Colo. 393, 399, 439 P.2d 355, 358 (1968); *Whittenberg, supra,* 110 Colo. at 420, 135 P.2d at 229. The hardship worked on Jensen by virtue of the covenant is undue, in light of the particular facts here. *See Zeff, Farrington & Assocs., supra,* 168 Colo. at 50, 449 P.2d at 814 (reasonableness of covenant not to compete depends on the facts of the case).

As previously noted, Jensen was paid $9,857 for his covenant, while the majority shareholder was paid more than ten times that amount. Jensen's covenant prohibited him from working in the only business in which he has ever worked for a period of three years in an area within 100 miles of Reed Mill's place of business in Denver (an area of over 31,000 square miles). The sum of $9,857 hardly relieves the burden of complying with such an extensive covenant. *See Knoebel Mercantile, supra* (covenant of two years duration deemed unreasonable where injury to former employee from enforcement of covenant would outweigh any benefit to employer).

Likewise, the sum the buyer paid for that portion of old Reed Mill's good will reposed in Jensen strongly suggests a gross imbalance between the scope of Jensen's covenant and what is necessary to protect the buyer's interest in that good will.

In sum, I would conclude that the covenant is unreasonable and, hence, unenforceable, albeit for reasons different from those expressed by the majority. Accordingly, while I respectfully disagree with the majority's rationale on that point, I concur in the result.